INHABITANTS OF FALMOUTH *vs.* FALMOUTH WATER
COMPANY.

Barnstable.     December 10, 1901. — January 3, 1902.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Equity Pleading and Practice. Corporation. Damages,* For statutory taking. *Statute,* Construction. *Waterworks. Falmouth.*

The report of an officer named as an auditor in a suit in equity is to be treated as a master's report.

Pub. Sts. c. 106, § 46, forbidding the transaction of business by certain corporations before their capital stock has been paid in does not apply to a water company.

Public service corporations subject to St. 1894, c. 450, and St. 1894, c. 452, can have no capital stock and no money paid in as capital until an issue is authorized by the board having jurisdiction in the premises. Following *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15.

St. 1898, c. 66, created the Falmouth Water Company and in § 12 provided, that the town of Falmouth should have the right to take the franchise, corporate property, and all the rights and privileges of the corporation, on payment to the corporation of " the actual cost " thereof, including in such cost interest on each expenditure from its date to the date of the purchase or taking at the rate of five per cent per annum. The corporation made a contract for the construction of its waterworks, by which they were to be finished on a certain day and the price to be paid for the principal part of the plant was " the cash market value "

on that day. The plant was built and delivered to the corporation on the day named, and four months later was taken by the town under the above provision. During the period of construction the price of the materials had greatly increased, so that on the day of completion the market value of the plant was much greater than the actual cost to the contractor. There was no fraud and the contract was made in good faith. *Held,* that the actual cost which the town must pay to the water company for its plant was the actual cost to the water company and included the profit of the contractor, and that, if the contract was unusual and unprecedented, this did not change the obligation, as the statute did not require the water company to make a contract which was usual, and the circumstances might have called for one that was unusual and unprecedented.

Under St. 1898, c. 66, § 12, giving the town of Falmouth the right to take the plant of the Falmouth Water Company on payment of the actual cost of its franchise, works and property, and providing, that on such taking the town should assume all of the outstanding obligations of the company, it was *held,* that the expenses of the company, incurred in enforcing by a suit in court its legal rights to the price to be paid for the taking under the act, could not be recovered from the town, being neither part of the "actual cost" of the franchise, works and property nor one of the "outstanding obligations" assumed by the town.

BILL IN EQUITY under St. 1898, c. 66, § 12, to ascertain and fix the total actual cost of the franchise, corporate property rights and privileges of the Falmouth Water Company taken by the town of Falmouth under that section, filed November 12, 1900.

The case was reserved by *Barker,* J., upon the pleadings, a report of auditors, treated by the court as a masters' report, and other documents on file in the case, for determination by the full court in accordance with the following stipulation signed in behalf of both parties:

"It is hereby agreed, subject to the approval of the court, that this case may be reserved for the full court upon the pleadings and the auditors' report for the determination of two questions of law:

"1. Whether the contract between the water company and Langford, if made in good faith, and the settlement of Langford's claim thereunder, against the company, made as a compromise between him and the company, were binding upon the town in this proceeding.

"2. Whether the expenses of this litigation incurred by the water company amounting to about $10,000, nearly all of which is outstanding against the company should be added to the amount otherwise receivable by the water company of the town.

"If it should be determined that the Langford contract was not binding upon the town, and that the actual cost might properly be ascertained in the manner adopted by the auditors, the actual cost of the water plant shall be taken to be, as found by the auditors, $120,320.46, with the allowance for interest, and less the deduction for income, stated in the auditors' report, leaving the net amount to May 1, 1901, $131,320.28, and subject to such determination as the court may make of the second question. It is agreed that the actual cost, assuming that the Langford contract and the settlement above mentioned are binding upon the town in this proceeding, is about $150,000, including interest and cost of maintenance to May 1, 1901, after deducting income, as provided in the statute. This sum does not include the company's expenses of litigation.

"If it should be determined that the Langford contract was, as matter of law, binding upon the town, the case is to stand for trial, if the town shall so request, on the question of fact as to whether the contract was made *bona fide*."

*R. M. Morse*, for the plaintiff.

*G. L. Mayberry*, (*J. E. Cotter* with him,) for the defendant.

LORING, J. The Falmouth Water Company was incorporated by a special charter, St. 1898, c. 66. On April first of the same year, it made a contract with one Langford, for the construction of a system of waterworks. The works were to be finished in nineteen months, to wit, on November 1, 1899; the price to be paid was "the cash market value at that time of the pumping station, machinery, stand pipe, pipes and connections," and in addition thereto such amount as was due for other work done and materials furnished, the work done being paid for at rates stated in the contract, and the materials furnished "at market prices"; and also "two and one half per cent to cover expenses of engineering, surveying, plans, etc., and five per cent additional to cover the average interest on all expenditures from April 1st, 1898, to November 1st, 1899." The plant was built and passed into the possession of the company at the date agreed upon, November 1, 1899. Four months after the company got possession of its plant, it was taken by the town of Falmouth, under § 12 of the charter of the company.

Section 12 provides that the town shall have the right to take

" the franchise, corporate property and all the rights and privileges of said corporation, on payment to said corporation of the actual cost of its franchise, works and property of all kinds held under the provisions of this act, including in such cost interest on each expenditure from its date to the date of the purchase or taking, as herein provided, at the rate of five per cent per annum." It also provides that in case of disagreement the amount due shall be fixed by this court in a suit in equity. The town and the company were unable to agree upon the amount due, and a suit was begun by the town to have the cost of the plant ascertained and fixed. The cause was referred to three officers, spoken of as auditors, and comes here by reservation on their report and the pleadings and other documents on file, and an agreement of the parties made part of the reservation.

Although it was stated by Chief Justice Shaw, in *Whitwell* v. *Willard*, 1 Met. 216, 218, that an auditor is an officer either at law or in equity, yet in *Holmes* v. *Turner's Falls Co.* 150 Mass. 535, it was intimated by this court that under existing statutes masters are to be appointed in suits in equity where auditors are appointed in actions at law. In our opinion that intimation is correct, and we shall treat the report made in this case as a master's report.

The masters find that a settlement was made between Langford and the company within a few months after November 1, and by the agreement, which has been made part of the reservation, it is stipulated " that the actual cost, assuming that the Langford contract and the settlement above mentioned are binding upon the town in this proceeding, is about one hundred and fifty thousand dollars (150,000), pursuant to the settlement set forth in Exhibit ' B,' including interest and cost of maintenance to May 1, 1901, after deducting income, as provided in the statute." The town contended " that the contract was invalid because it had never been legally executed; that in fact it was not executed until after the works had been completed, and that the contract itself and the settlement between the company and Langford were fraudulent as respects the town." The masters found that the contract was not illegally or fraudulently made, and ruled that the town was correct in its contention, " that the contract was not binding upon the town in this proceeding as

fixing the actual cost to that date [November 1, 1899] because the contract provided, as hereinbefore stated, for the payment to Langford of the market value of a large part of the works as their cost, whereas the provisions of the act contemplated that the town should be charged in this proceeding only with the total actual cost, and that the substitution of the terms of the contract for the provisions of the act would defeat the purpose of the act." In this connection they say : " It appeared without contradiction that the provision spoken of was unusual and unprecedented in contracts of this character, and that the effect of it in the present case, owing to the great rise of materials during the construction of the works, operated to charge the town with a sum much above the actual cost of the works to the contractor." Under this ruling the masters found that the actual cost to the contractor, plus a fair going profit above cost to him, was $131,320.28.

In our opinion the ruling on which the masters proceeded was wrong.

On the findings of the report we must take it that the water company was a real thing distinct from Langford, that there were really two parties to the contract, that it was made at the time it is dated, April 1, 1898, and that it was made in good faith and without any ulterior motives with respect to the town and its right to take the property of the corporation.

Whether these are in truth the facts of the case has not been finally determined. But for the purposes of the discussion of the questions presented to us we must assume them to be true.

It has been contended by the town that the company acted illegally in making a contract with Langford before paying in its capital stock. But the corporation was not forbidden to begin the transaction of business before its capital stock was paid in. The provisions of Pub. Sts. c. 106, § 46, forbidding the transaction of business before capital stock is paid in, are not applicable to all corporations, but only to manufacturing and other corporations organized under, or subject to, Pub. Sts. c. 106 ; this corporation is not subject to Pub. Sts. c. 106, but to Pub. Sts. c. 110, and St. 1894, cc. 380, 452.

There was no impropriety in this corporation having its plant constructed for it before any capital stock was paid in, and after-

wards applying for an issue of capital stock and bonds on the completion of its works.

It will be convenient here to dispose of a misapprehension as to the status of this corporation, which became apparent during the argument and derives some support from the masters' report; that is that the surrender by Langford to the corporation of his receipts to the amount of $75,000, given on being paid that sum of money by " the treasurer of the company as an individual," was a payment of capital stock. This is a misconception of the status of a public service corporation, which is subject to St. 1894, c. 380, or St. 1894, c. 452. Such a corporation neither has, nor can have, a capital stock or any part of a capital stock, until an issue thereof is authorized by the board having jurisdiction in the premises. If an attempt is made before such authority is obtained, to receive subscriptions to the capital stock of the corporation, and money is in fact paid to the corporation as a payment of capital stock, the payment is not a payment of capital stock, but a payment of money without consideration. *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15. In this case, if money was paid to Langford for sums due him from the corporation for construction of the waterworks under the contract, and he gave his receipts to the treasurer of the corporation as an individual for that payment, it was either a loan by the treasurer to the corporation and a payment by the corporation to Langford, or it was a loan by the treasurer as an individual to Langford, to the amount of a debt due from the corporation to him, which still remained unpaid. This corporation was a corporation without a capital stock, building its work under contract on credit.

This, then, is a case where the company in good faith made a contract for the construction of its plant, to be paid for substantially on the basis of the " cash market value " of it at completion, where it never had any capital stock and never had issued any bonds, where it made a settlement with the contractor, fixing the amount due him in accordance with the contract, and owes the amount thereof either to the contractor, or to a creditor, who has lent it the money paid to the contractor, or in part to one and in part to the other; and where, after the company had operated its works for four months, its property

was taken by the town; and the question is what is the actual cost of the property within the meaning of St. 1898, c. 66, § 12.

We have no hesitation in saying that it is the actual cost of the plant to the water company. The masters have construed St. 1898, c. 66, to be a statute restricting the water company in the matter of making a contract for the construction of its works, to a contract for the cost to the contractor, plus a fair going profit above cost to him. But the statute in question, St. 1898, c. 66, is not such a statute. This act does not make the company an agent of the town, to raise and advance the required cash in consideration of getting five per cent for the use of its money, as argued by the town; there is nothing in the act which abridges the right of the corporation to manage its affairs as it deems to be best for the interest of those interested in the corporation. Until the corporation has a capital stock the persons named in the charter own the corporation, just as those holding shares in the capital stock own it after a capital stock is brought into being, and just as the persons named in the articles of association and their associates own the corporation in case of educational and other corporations organized under Pub. Sts. c. 115, without a capital stock. The fact, that the town is given the right to take the property of the company by the right of eminent domain, does not affect the right of the company to conduct its affairs as it deems best for those interested in it, until its property is taken for the use of the public; and the fact that the terms on which its property is to be taken, if it is taken, are payment of the actual cost of it, does not affect the right of the corporation to conduct its affairs, including the building of its plant, as to it seems wise, until its property is taken for the public use.

It is argued that, even if this is so, the actual cost to the company under this contract is not the actual cost within the meaning of the act, because it is found in the report that this contract " was unusual and unprecedented." But there is nothing in the statute limiting this corporation to contracts, which are usual and in accordance with precedents. The fact that it is unusual and unprecedented may have a bearing on the question whether it was made in fraud of the rights of the town. But, so long as it was not made in fraud of the rights of the town, it is within

the rights of the corporation, even if it is unusual and unprecedented. And it may well be that an unusual and unprecedented contract was called for by the fact that it was made under unusual and unprecedented circumstances. As pointed out by counsel for the town, it was made twenty days before war was declared against Spain; it might well be that the company thought that a contractor, in fixing a price for which he would build a plant at that time, would make it large enough to cover the possible rise in values, which would follow if war was declared, and that under those circumstances it was wiser to let the price depend upon the event, as was done in the case at bar. And, further, it may be that such a contract was desirable because no capital stock or bonds were to be issued until the plant was completed; in such a case the commissioner of corporations might adopt as the basis, on which he proceeded, the cash market value of the completed plant at the time the stock and bonds were issued; in that case, if values had shrunk between the date of the contract and the completion of the work to as great an extent as it turned out in fact that they rose in this instance, the corporation would have incurred debts exceeding the capital stock and bonds to which it would be authorized, by the amount of $20,000.

It is argued by the town that this result amounts to substituting market value for actual cost, and actual cost excludes everything in the nature of a profit. It is true that actual cost excludes everything in the nature of a profit; but what is actual cost to the company includes a profit to the contractor, just as what is actual cost to the contractor includes a profit to the merchants of whom he buys his material. The company had to pay a profit to the contractor as the contractor had to pay a profit to the material men. The Legislature no more intended to open up the speculative question of the reasonableness of the profit made by the contractor in his contract with the company, than that of the reasonableness of the profit made by the material men in their contract with the contractor. What it intended to do, was to provide, that the price, to be paid by the town, should not depend upon opinions as to the market value of the property when taken, but should be restricted to what it had cost the company, with interest at five per cent. That did not forbid

the company in the first instance fixing the price, which it was to pay for the construction of its works, at the market value on completion, if it thought it to be for the best interests of those interested in the corporation to make a contract for its plant on that basis.

The other question reserved for our consideration is "Whether the expenses of this litigation incurred by the water company amounting to about ten thousand dollars ($10,000), nearly all of which is outstanding against the company should be added to the amount otherwise receivable by the water company of the town." The argument of the company is, that the expenses of litigation should be added, because it was the intent of the act to give those investing their money in the Falmouth Water Company the money put into the adventure with five per cent interest. It is true that there is such a general intention manifested in the act, but there is no provision in the act broad enough to cover these expenses. The expenses of this litigation are not a part of "the actual cost of its [the company's] franchise, works and property of all kinds held under the provisions of this act," but they are the expenses incurred in enforcing in a suit in court the legal rights of the company to the price to be paid for the property, which has been taken by the town. Neither are the expenses of this litigation one of the "outstanding obligations" of the company, within the meaning of those words in § 12, providing that the town "shall assume all of its [the company's] outstanding obligations." Section 12 contemplates that the town shall pay the company the amount found to be due it in cash, so far as that is possible under the circumstances ; but if the company has outstanding any bonds not yet due, which cannot be paid off, or has come under a liability in the operation of its plant, which has not been ascertained, as in *New Bedford Railroad* v. *Old Colony Railroad*, 120 Mass. 397, or if it has assumed in connection with its plant obligations for the performance of things other than the payment of money, such obligations shall be assumed by the town, because they cannot be paid off in money. It was not intended by this clause to enlarge the definition, given in the earlier part of the section, of what was to be paid for, namely, "the actual cost of its franchise, works and property"; and however equitable it

would have been to put upon the town in such a case as this, the expenses of a litigation as to the amount due the company, in which the town was in the wrong, it is decisive of the matter here that the Legislature did not so provide.

Apart from St. 1898, c. 66, the only expenses of litigation which can be recovered from the adverse party in a suit in court are taxable costs.

By the terms of the stipulation made a part of the reservation, the suit is to stand for hearing, " if the town shall so request, on the question of fact as to whether " the contract between the company and Langford " was made *bona fide* " ; if it do not so elect, the suit is to stand for hearing as to the actual cost of the franchise, works and property of the company.

*So ordered.*