## Town of Oxford vs. Oxford Water Company.

Worcester. January 13, 1984. — March 29, 1984.

Present: Hennessey, C.J., Abrams, Lynch, & O'Connor, JJ.

*Practice, Civil,* Declaratory proceeding. *Public Utilities,* Value. *Water Company. Municipal Corporations,* Water supply. *Statute,* Construction. *Value. Words,* "Actual cost," "Investment."

This court granted declaratory relief under G. L. c. 231A to the town of Oxford concerning its right under St. 1904, c. 193, § 9, "to take by purchase . . . the franchise, property, rights and privileges" of the Oxford Water Company "on payment of the actual cost thereof," even though the town had not yet voted to purchase the company. [584-585]

The "actual cost" of the property of the Oxford Water Company, to be determined as of the time the town of Oxford might vote to purchase the company under St. 1904, c. 193, § 9, means the original cost of the property to the company without allowance for depreciation, and does not include the value of any property which the company acquired either without cost or with funds advanced by its customers, except to the extent that the company has repaid those advances. [585-591]

The term "the investment" as appearing in St. 1904, c. 193, § 9 providing that there may be added to the purchase price of the Oxford Water Company a sum as will make "the net return to the stockholders five per cent per annum on the investment" refers to the amount the stockholders paid into the company for the capital stock, plus earnings retained by the company. [591-592]

The town of Oxford has the right pursuant to St. 1904, c. 193, § 9, to assume certain bonds issued by the Oxford Water Company, and secured by a mortgage, as part payment of the town's purchase price for the company. [592-593]

Civil action commenced in the Superior Court on December 29, 1977.

The case was reported to the Appeals Court by *Hallisey*, J. The Supreme Judicial Court granted a request for direct review.

*William T. Talcott, Jr.,* for the plaintiff.

*Lane McGovern* for the defendant.

LYNCH, J. The town of Oxford seeks declaratory relief pursuant to G. L. c. 231A, concerning its right under St. 1904, c. 193, § 9, "to take by purchase . . . the franchise, property, rights and privileges" of the Oxford Water Company (company) "on payment of the actual cost thereof." The statute further provides that "unless the dividends earned and declared by said company on its stock shall be equal to or in excess of five per cent per annum there shall be added to the first cost such a sum as will make the net return to the stockholders five per cent per annum on the investment." The town alleges that there is an actual controversy between the parties as to the meaning of the terms "actual cost" and "investment," and as to whether the town has the right to assume certain bonds issued by the company and secured by a mortgage as part payment of the purchase price.[1]

The case was commenced in the Superior Court in Worcester County and, at the request of both parties, the judge reported it to the Appeals Court without decision. G. L. c. 231, § 111. This court allowed the company's application for direct appellate review. G. L. c. 211A, § 10(A). We hold that an actual controversy exists on which we are permitted to make a binding declaration of right under G. L. c. 231A. We further hold that "actual cost" means the original cost of the investment less the cost of property contributed to the company; that "investment" refers to the amount the stockholders paid for the stock plus any earnings retained by the company; and that the town is authorized to assume the Series C mortgage bonds as part of their payment to the company.

The facts were stipulated to by the parties. The company is a corporation chartered in the Commonwealth by special act, St. 1904, c. 193, and is presently engaged in furnishing the inhabitants of the town with water for domestic, industrial, commercial, and other purposes, including fire protection. Its assets include real estate, both land and buildings, and substan-

---

[1] The company's special act charter, St. 1904, c. 193, § 9, also provides: "If said town shall so take said property it may as part payment assume any indebtedness of said corporation incurred in the construction or improvement of the property, by lawful issue of bonds secured by mortgage."

tial personal property making up its distribution system through which it supplies water to its customers. These assets have been acquired by the company at various times throughout its existence. Some of the property making up the distribution system was acquired not through investment of the company's own capital, but as a result of "contributions" from developers and others for extension of water lines to their property. Since July, 1923, the company has been required to keep, and has kept, its books and accounts, and has filed returns for each year in accordance with the Uniform Classification of Accounts for Water Companies (1923), the forms prescribed by the Department of Public Utilities under St. 1920, c. 583, § 2, and made applicable to the company by St. 1920, c. 295.

On October 16, 1976, by a unanimous vote at a special town meeting, the town's board of selectmen was authorized to appoint a five member committee to be known as the water study committee. This committee was authorized to investigate the advisability and feasibility of acquiring the company by purchase or by exercise of the right of eminent domain and to report its findings and recommendations at the 1977 town meeting.

At the annual town meeting on May 11, 1977, the town unanimously voted to appropriate $600,000 for the purpose of purchasing the company's corporate franchise, property, rights and privileges. The vote further authorized the water study committee, on behalf of the town, to negotiate with the company to make this purchase, to consummate a purchase for a price not to exceed $600,000, and to pay the purchase price in part by assuming as much of the indebtedness of the company incurred in the construction or improvement of its property by the lawful issue of bonds secured by mortgage as the committee should deem advisable. In the event that the committee and the company were unable to agree on a price, the committee was further authorized to initiate and prosecute any litigation appropriate to determine the amount of the purchase price that the town should pay. On July 25, 1977, the committee offered

to purchase the franchise, property, rights and privileges of the company for $494,724. This purchase price included "actual cost," which the town calculated in accordance with this court's holding in *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209 (1976), and that sum necessary to make the net return to the stockholders of the company five percent on the investment, which the town deemed to be the purchase price of the stock plus earnings retained by the company. The town also indicated it would like to assume the Series C first mortgage bonds as part of the purchase price. On August 5, 1977, the company declined this offer calling it "entirely inadequate." The parties to the present date have failed to agree on a specific purchase price or on how the disputed terms in St. 1904, c. 193, § 9, should be defined.

1. *Declaratory judgment.* The town contends that this case presents an actual controversy appropriate for declaratory judgment within the meaning of G. L. c. 231A. The company's position is that the town has not yet voted to purchase the franchise, property, rights and privileges of the company and that, by this proceeding, the town is seeking an advisory opinion on the basis of which it will decide whether in fact it will purchase.[2] The company's argument is that the town must absolutely commit itself to the purchase, before it even knows what the price will be. We found declaratory relief appropriate in *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209, 214-215 (1976), and we see no reason to reach a different decision here. It is not necessary that the parties be irrevocably bound to a course of action before a court can afford declaratory relief. See, e.g., *LaCouture* v. *Retirement Bd. of Quincy*, 11 Mass. App. Ct. 738, 744-745 (1981) (plaintiff was not obliged to retire before ascertaining by declaratory judgment what his pension would be).

---

[2] It is provided in St. 1904, c. 193, § 9, that "[t]he authority to purchase or take the franchise and property of said corporation shall be exercised by said town only after the town has voted to purchase or take the same." As described above, in this case the town voted to appropriate money and authorized negotiation and consummation of a purchase by the water study committee.

The purpose of the declaratory judgment procedure is to remove uncertainty. In this case, it will "enable the parties to deal intelligently with the situation before them, to agree between themselves as far as possible, and to reduce as much as possible the area of future litigation." *Cohasset Water Co.* v. *Cohasset*, 321 Mass. 137, 149 (1947).

2. *Actual cost*. This court had its first occasion to consider the meaning of the term "actual cost" as used in special acts such as the one considered here in *Southbridge* v. *Southbridge Water Supply Co., supra* at 215.[3] There we held that "actual cost" should be calculated in substantially the same way as the Department of Public Utilities (department) determines the rate base for the purpose of setting rates. *Id.* at 216. The rate base is "the amount of the investment on which the company is entitled to an opportunity to earn a fair and reasonable return." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 450 (1971). It is computed on the basis of original cost, less accrued depreciation and less certain other deductions, and is derived from the company's books. *Southbridge, supra* at 216. One advantage to this definition of "actual cost," as the issue was presented to the *Southbridge* court, was the relative ease of calculation, since the necessary figures would be found largely in the records kept by the company in accordance with the Uniform Classification of Accounts for Water Companies (1923), and submitted to the department in rate setting proceedings. A second advantage was that using the rate base calculation would take into consideration "the depreciation accrued on capital items over the years and recovered by the company through the rates which it has been permitted to charge." *Id.* at 216.

The company urges us to reconsider our holding in *Southbridge* for three reasons. It contends that equating "actual cost" with the formula used by the department to derive the rate base (1) strains the literal meaning of the words "actual cost" in

---

[3] The statute in the *Southbridge* case was virtually identical to the one here. The town of Southbridge had the right under St. 1880, c. 73, § 7, to purchase the corporate property and all the rights and privileges of the water company "at the actual cost of the same."

that it includes implied deductions (such as depreciation); (2) is at odds with what the Legislature intended when it enacted c. 193 in 1904, because neither the concept of a rate base nor the concept of depreciation was in use at that time; and (3) it hampers the objective of the statute by complicating the determination of compensation to be made by the town.

Although much of the holding in *Southbridge* is applicable to the record before us, we do not feel bound to accept here that case's definition of "actual cost." In *Southbridge*, the company contended that the "actual cost" was "the full cost of the creation of the present system in its present condition." *Id.* at 215. This included, the company claimed, every single expenditure made by the company relative to "the planning, acquisition, construction, erection, installation, preparation, creation and preservation of the present functioning system." *Id.* Faced with the choice between such a complex and unworkable definition of "actual cost" and the relatively straightforward calculation based on the company's rate base, the court understandably opted for the latter. In contrast, the record now before us presents two equally workable definitions of "actual cost." We, therefore, reconsider the definition of "actual cost" in light of the facts and arguments applicable to this case.

We commend the company for its thorough presentation and discussion of the history of the term "actual cost" as used in the numerous statutes comparable to St. 1904, c. 193, enacted around the turn of the century, and of the development of accounting procedures in the public utility industry. It seems quite clear on the record before us, that in 1904 the Legislature intended "actual cost" to mean original cost, the amount of money originally paid, as distinguished from any estimated cost, such as fair market value, or depreciated value. See, e.g., *Falmouth* v. *Falmouth Water Co.*, 180 Mass. 325, 331 (1902) ("[T]he actual cost of the property within the meaning of St. 1898, c. 66, § 12 . . . is the actual cost of the plant to the water company"). See also *Mayor of Worcester* v. *Boston & Albany R.R.*, 213 Mass. 567, 571 (1913) ("The cost is actual cost as distinguished from estimated price or market value . . ."); H. Spurr, Guiding Principles of

Public Service Regulation 294 (1924). It is also clear that early in this century, depreciation was not considered a "cost," but if anything, represented a loss in value. From 1876 to 1908, "the law in the United States would seem to have frowned upon any recognition of depreciation in advance of the replacement of property." Scharff, Public Utility Depreciation, 38 Colum. L. Rev. 1037, 1038 (1938). *Knoxville* v. *Knoxville Water Co.*, 212 U.S. 1, 13 (1909). See also *Boston & Albany R.R.* v. *New York Cent. R.R.,* 256 Mass. 600, 613 (1926). Not until thirty years after the *Knoxville* decision did the use of straight-line depreciation reserves come to be accepted and regularly used in utility accounting.

The company argues that we must interpret the term "actual cost" to mean today what the Legislature intended it to mean in 1904. The traditional rule of statutory interpretation, as stated in *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934), is that "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." The company is correct that historical context is important. When words are not defined in a statute we should "derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions."[4] *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977). However, we should not simply accept the literal 1904 meaning of the words without regard for the statute's purpose. Understanding the intent of the Legislature is far more important than ascertaining how the term "actual cost" was defined in a 1904 dictionary. The dictionary definition is helpful, but it should not be dispositive. In *Commonwealth* v. *Welosky*, 276 Mass.

---

[4] "Actual cost" is not a technical term which has developed a special legislative meaning. "It is a general or descriptive term which may have varying meanings according to the circumstances in which it is used."*Boston Molasses Co.* v. *Molasses Distribs. Corp.*, 274 Mass. 589, 594 (1931).

398, 401-402 (1931), we said: ''Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part, and in the light of the Constitution and of the common law, to the end that they be held to cover subjects presumably within the vision of the Legislature and, on the one hand, be not unduly constricted so as to exclude matters fairly within their scope, and, on the other hand, be not stretched by enlargement of signification to comprehend matters not within the principle and purview on which they were founded when originally framed and their words chosen.''

What did the Legislature intend in 1904 when it said that the town could purchase the company at ''actual cost''? What this court said in 1902 (with respect to a similar statute of 1898) was that it intended ''to provide, that the price, to be paid by the town, should not depend upon opinions as to the market value of the property when taken, but should be restricted to what it had cost the company.'' *Falmouth* v. *Falmouth Water Co.,* 180 Mass. 325, 332 (1902). What the court said in 1906 (with respect to a statute of 1887) was that ''[t]he effect of this provision, in case of a taking by the town, is to guarantee to the corporation the return of all the money invested in the enterprise.'' *Tisbury* v. *Vineyard Haven Water Co.,* 193 Mass. 196, 198 (1906). The intent of the Legislature, then, was to reimburse the company for its investment.

It is important to note, however, that, in these decisions, the court was applying a statute that was no more than twenty years old. It was reasonable for the court to say in 1906 of the 1887 statute: ''Whether the statutory provision is liberal or illiberal is a question with which we are not now concerned. It is a provision under which the corporators were willing to act.'' *Tisbury* v. *Vineyard Haven Water Co., supra* at 200. What was reasonable in 1904 may be far from reasonable in 1984, and it may be necessary to use some method other than that provided by the statute to effectuate the statute's purpose. ''Statutes framed in general terms commonly look to the future and may include

conditions as they arise from time to time not even known at the time of enactment, provided they are fairly within the sweep and the meaning of the words and falling within their obvious scope and purpose." *Commonwealth* v. *Welosky, supra* at 403.

Having established that the purpose of the Legislature in 1904 was fairly to compensate the investors for their investment, we must determine what method of calculation, in 1984, will best achieve this purpose. In doing so, we must keep in mind that the Legislature also intended that the compensation be easily and accurately calculable. The court in the *Southbridge* decision computed "actual cost" on the basis of the company's rate base, that is, the original cost less accrued depreciation. We might also look to methods of valuation for purposes of compensation for a taking by eminent domain.[5] The fact that this compensation is characterized as "fair market value" should not deter us if in fact it is the measure that most closely approximates what the Legislature in 1904 intended.[6] When the property taken by eminent domain is "special purpose property," that is, it is not of a type frequently bought or sold and is used for a special or unusual purpose, the accepted way to determine fair market value is reproduction cost less depreciation.[7] *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 147 (1967).

Reproduction cost less depreciation is also one of the methods used to calculate the value of special property for purposes of tax assessment. *Montaup Elec. Co.* v. *Assessors of Whitman*, 390 Mass. 847, 850 (1984). Another method is based on "net book cost" which is the "original cost of property when first devoted to a public use, less accrued depreciation." *Id.* The town suggests we use original cost less accrued depreciation.

[5] The court recognized in *Cohasset Water Co.* v. *Cohasset*, 321 Mass. 137, 144 (1947) that "a compulsory sale of the kind contemplated is in certain respects analogous to a taking."

[6] We would not be obliged to adopt every aspect of the eminent domain calculation of fair market value. That computation includes, for example, compensation for property contributed to the company, see 590-591, *infra*.

[7] At least in the context of valuation for tax assessments, a public utility is considered a special purpose property. *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 301 (1982).

The company thinks we should use original cost, with no deduction for depreciation.

The question is which of these methods best approximates the intent of the Legislature in 1904. If the town must pay reproduction cost, even less depreciation, the company will be getting the benefit of appreciation and inflation of the cost of property and equipment. All the other methods are based on original cost, the only difference being whether or not depreciation should be deducted. In our opinion, depreciation should not be deducted from the original cost. Depreciation accounting is a way of recognizing that tangible property does not last forever. A machine that "cost" one hundred dollars, even after it has been fully depreciated, still "cost" one hundred dollars. Depreciation is a "process of allocation, not of valuation." S. Davidson, Modern Accounting 18-2 (1970). The only reason to deduct accrued depreciation from original cost in determining "actual cost," therefore, would be to prevent a windfall to the company. In this case it is argued that depreciation has been recovered through the rates charged by the company.[8] Whether depreciation is characterized as an expense or a recovery of capital investment is largely a matter of semantics. It has been said that "[c]ustomers pay for service, not for the property used to render it. Their payments are not contributions to depreciation . . . or to capital of the company." *Public Util. Comm'rs* v. *New York Tel. Co.*, 271 U.S. 23, 32 (1926). Modern rate calculation does take depreciation into account, characterizing it as an expense. In this case, it does not appear to us that construing the statute in its literal sense would be so unfair as to require us to apply modern methods of accounting which were not contemplated in 1904. Therefore, "actual cost," as that term is used in St. 1904, c. 193, § 9, means original cost.

The company also argues that "actual cost" includes the cost of property purchased or constructed with contributed funds.

[8] The court in *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209, 216 (1976), suggested that depreciation is recovered through the rates charged. While that may have been warranted on the facts of that case, on the record before us it is not clear that depreciation was included in determining the company's rate for the entire period in question.

We think this interpretation is contrary to the purpose of the 1904 statute. It was intended that the investors receive a five percent return on their original investment. The statute says nothing about a return on contributed property. The fact that the company pays taxes on, maintains, and ''owns'' the contributed property does not change the fact that it did not pay for it originally. That the value of contributed property would be included in compensation for a taking by eminent domain is irrelevant. When property is taken by eminent domain, just or reasonable compensation must be awarded to the owner so as to restore to him, as nearly as possible, the value of the property of which he is being deprived. Here we are seeking to interpret the statute by which the proprietors of the water company acquired the franchise under which it operates. Our task, therefore, more nearly resembles interpreting a contract than determining what constitutes just or reasonable compensation sufficient to justify a taking of private property under the Federal and State Constitutions. In this context it seems clear that property which the company acquired without cost is not to be included in determining the ''actual cost'' of the company's property. Similarly, ''actual cost'' may not include property constructed with those funds referred to as ''customer advances for construction,'' except to the extent that the company has repaid those advances.

3. *The return on the investment.* The parties also disagree about the interpretation of the provision of St. 1904, c. 193, § 9, that the purchase price of the corporate property and franchise include such amount as shall make ''the net return to the stockholders five per cent per annum on the investment.'' The town argues that the term ''the investment'' refers to the amount the stockholders paid into the company for the capital stock plus earnings retained by the company. On the other hand, the company contends that ''the investment'' means either the company's total investment in plant and equipment or, alternatively, its total invested capital, bonds and stock. We conclude that the plain language of the statute supports the town's interpretation and that to interpret it any other way would defeat the Legislature's purpose.

The company's interpretation of the term "the investment" is overly literal. The words of a statute will not be read literally if to do so would be inconsistent with legislative intent. *Attorney Gen.* v. *School Comm. of Essex,* 387 Mass. 326, 336 (1982). Here, the legislative intent is plain when the phrase in question is read in context. The statute says that no amount above "actual cost" need be paid by the town if "the dividends earned and declared by said company *on its stock* shall be equal to or in excess of five per cent per annum" (emphasis added). If the dividends paid on the stock are less, a sum must be paid so as to bring up to five percent "the net return *to the stockholders*" (emphasis added). The plain meaning of this phrase is that the Legislature wanted the *stockholders* to be assured a fair return on their investment, not that it wanted the *utility* to be assured a reasonable return. The phrase "the investment" must be read in the context of the provision as a whole. "A general term in a statute or ordinance takes meaning from the setting in which it is employed. The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent." *Haas* v. *Breton,* 377 Mass. 591, 595 (1979), quoting *Kenney* v. *Building Comm'r of Melrose,* 315 Mass. 291, 295 (1943). Thus, the company's arguments concerning the special meaning of "investment" in the regulatory history are not persuasive.

4. *The assumption of the Series C first mortgage bonds.* The statute further provides that the town "may as part payment assume any indebtedness of said corporation incurred in the construction or improvement of the property, by lawful issue of bonds secured by mortgage." It does not prohibit the assumption of some but not all of the indebtedness. Furthermore, it expressly sanctions the assumption of bonds secured by mortgage. It must be assumed that the bond holders acquired their investment with knowledge that the bonds might be assumed by the town. What rights they may possess against the town in case of any default is not before us and need not be decided. We are not persuaded that *Wilkinson* v. *Hoffman,* 61 Wis. 637 (1884) (mechanic's lien may not be enforced against a municipal waterworks), com-

pels the conclusion, as the company contends, that assumption of these bonds would be contrary to public policy.

5. *Miscellaneous issues*. The parties also ask us to establish the time as of which the purchase price due the company should be fixed. The logical choice is as of the time the town votes to purchase. *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209, 216 (1976). *Rockport Water Co.* v. *Rockport*, 161 Mass. 279, 280 (1894).

Finally, we are not persuaded by the company's argument that St. 1904, c. 193, § 9, is no longer in effect, having been replaced by the general eminent domain statute of 1918, now G. L. c. 79. This contention was rejected in *Southbridge, supra* at 217. We have noted that the compulsory purchase provision of § 9 is *analogous* to a taking by eminent domain, but it is not the equivalent of a taking by eminent domain.

6. *Conclusion*. To summarize, we hold that the "actual cost" of the franchise, property, rights and privileges of the company shall be determined on the basis of original cost. It shall not be reduced by a deduction for accrued depreciation, nor shall it include the cost of that property contributed or advanced to the company (except that property advanced to the company may be included to the extent that the advances have been repaid). "Actual cost" shall be determined as of the time the town votes to purchase. Any sum added to ensure a five percent per annum return to the stockholders shall be based on the stock only. Finally, the town may assume the Series C first mortgage bonds as part of the purchase price.

The case is remanded to the Superior Court for the entry of judgment declaring the rights and liabilities of the parties in accordance with this opinion.

*So ordered.*