Ricciardone, David, J.
The Town of Oxford (“the Town”) brought this action for declaratory judgment against Aquarion Water Company of Massachusetts, Inc. (“Aquarion”), seeking a determination of what it will cost the Town to purchase Aquarion’ s water supply system pursuant to 1904 legislation granting the Town the unilateral right to purchase Aquarion’s “franchise, property, rights and privileges on payment of the actual cost thereof’ (“the Charter”). St. 1904, c. 193, §9.
The matter is before the Court on Oxford’s Motion for Partial Summary Judgment (Paper No. 21) and Aquation's Motion for Partial Summary Judgment (Paper No. 24). For the following reasons, the Town’s Motion is ALLOWED in part and DENIED in part and Aquaiion’s Motion is DENIED, with declarations set forth in the Order.
BACKGROUND
The Oxford Water Company was incorporated in 1904 pursuant to the Charter, which provides in relevant part that:
The Town of Oxford shall have the right at any time to take by purchase or by the exercise of the right of eminent domain, the franchise, property, rights and privileges of [the Oxford Water Company] on payment of the actual cost thereof; and unless the dividends earned and declared by said company on its stock shall be equal to or in excess of five per cent per annum there shall be added to the first cost such a sum as will make the net return to the stockholders five per cent per annum on the investment . . . And the taking, if by exercise of the right of eminent domain, shall be by filing in the registry of deeds ... a declaration of such taking . . .
St. 1904,c. 193, §9.
In 1977, the Town voted to appropriate $600,000 to use toward purchasing Oxford Water Company’s franchise, property, rights and privileges pursuant to the Charter. A committee charged with determining the appropriate purchase price and overseeing the acquisition offered Oxford Water Company $494,724. Oxford Water Company rejected the offer as “entirely inadequate.” After the parties were unable to agree on a purchase price, the Town brought an action for declaratoiy judgment in the Superior Court. The case was reported to the Appeals Court without decision, and the Supreme Judicial Court (“SJC”) granted Oxford Water Company’s request for direct appellate review.
In 1984, the SJC held that “actual cost” under the Charter means the “original cost” of the company’s investment — that is, “the amount of money originally paid, as distinguished from any estimated cost, such as fair market value, or depreciated value” — less the cost of property contributed to the company. Oxford v. Oxford Water Co., 391 Mass. 581, 586, 590-91 (1984). The Court also held that actual cost does not include a deduction for accrued depreciation, modifying the formula it had adopted in an earlier case involving a similar charter, Southbridge v. Southbridge Water Supply Co., 371 Mass. 209 (1976). See Oxford Water Co., 391 Mass, at 590. The Court remanded the case to the Superior Court for entry of judgment declaring the parties’ rights and liabilities in accordance with the decision. Id. at 593.
Even with the SJC’s guidance, the parties were unable to consummate a sale, due in large part to Oxford Water Company’s position that the “actual cost” formula established in the 1984 decision applied only to company’s “property,” i.e., its utility plant assets, and that the company was entitled to additional compensation for its franchise, rights and privileges.
In 2002, after a series of corporate combinations, Aquarion became the owner and operator of the Town’s water supply system. In January 2009, the Town notified Aquarion that it intended to exercise its rights under the Charter to purchase the system. In February 2009, Aquarion responded by stating that the system was not for sale. On May 6, 2009, Oxford voters approved by a greater-than-two-thirds margin a $6.7 million appropriation to fund acquisition of Aquation’s system. Aquarion has refused to sell at a price based on the Town’s “actual cost” calculations, insisting that the Town’s only option is to take Aquar-ion by eminent domain, which requires that just compensation be paid.
The Town’s Motion for Partial Summary Judgment seeks declarations that (1) the “actual cost” of Aquation’s franchise, property, rights and privileges must be calculated in accordance with the formula set forth in Oxford Water Co., and Aquarion is not entitled to recover costs that are not encompassed in that *404 formula or are not properly documented;[1] (2) the Charter’s 5% per annum provision provides for a cumulative 5% return, rather than an annual calculation, and permits an offset for each year in which the company’s dividend payments exceeded 5%; (3) any added cost pursuant to the 5% per annum provision is not adjusted for time value; (4) such added cost is calculated based only on money received for the issuance of stock and used for operating capital; and (5) upon the Town’s tendering to Aquarion an amount that reflects the company’s “actual cost” and any amount necessary to effect a 5% net return on stockholders’ investment, Aquarion shall transfer to the Town ownership and operation of its franchise, property, rights and privileges.
Aquarion’s Motion for Partial Summary Judgment seeks declarations that (1) the Charter’s 5% per annum provision is calculated based on what stockholders paid for their stock and any earnings retained by the company; (2) the 5% per annum provision does not permit an offset for years in which dividends exceeded 5%; and (3) the added cost for any years in which there was a dividend shortfall must be adjusted for time value.
DISCUSSION
This protracted legal battle essentially boils down to the fact that the Legislature’s succinct instructions for reimbursing the company left much to the parties’ imaginations, as did, it would seem, the SJC’s 1984 decision. Aquarion argues that the SJC’s actual cost formula does not encompass “franchise .. . rights and privileges,” and that these intangible assets must be valued separately. It also argues that the SJC’s formula does not extend to circumstances in which the Town is forced to take by eminent domain because the parties cannot agree on a purchase price.
In Oxford Water Co., the SJC interpreted the Charter against the backdrop of the parties’ active negotiations for the purchase of the water supply system. Here, by contrast, the parties are not negotiating a purchase, as Aquarion has unequivocally refused to sell on the Town’s terms. Rather, the parties are in a holding pattern, wherein the Town seeks a definitive ruling that Oxford Water Co. is controlling and that certain costs and expenses that Aquarion has proposed are not included in the SJC’s actual cost formula. Meanwhile, Aquarion seeks a contraiy ruling and insists the Town must pay “just compensation” for the water supply system in accordance with traditional constitutional taking principles.
From these circumstances, three related issues arise: (1) whether there is a meaningful distinction between a taking “by purchase” and a taking “by the exercise of the right of eminent domain” under the Charter; (2) if so, whether Aquarion can force the Town to take by eminent domain, rather than by purchase; and (3) if Aquarion can force the Town to resort to eminent domain, whether the Town’s action requires “just compensation” beyond the compensation afforded by the “actual cost” formula in Oxford Water Co.
The Court answers the first question in the negative and concludes, therefore, that the SJC’s decision in Oxford Water Co. controls the compensation to which Aquarion is entitled.
1. Taking by purchase versus taking by eminent domain
A plain reading of the Charter reveals the Legislature’s intent that “actual cost,” however that term was to be defined under the prevailing accounting principles of the time, would be sufficient payment for taking the chartered water company, whether by purchase or by eminent domain. The phrase “on payment of the actual cost thereof’ clearly modifies the entire phrase “Oxford shall have the right... to take by purchase or by the exercise of the right of eminent domain.” St. 1904, c. 193, §9. For reasons discussed below, Aquarion’s position that “actual cost” has a different meaning depending on the manner of taking is unpersuasive.
To start, adopting Aquarion’s reading of the Charter would render the “taking by purchase” provision illusory and, by extension, would leave the SJC’s Oxford Water Co. decision toothless. Aquarion’s stance is that it may effectively parry the Town’s unilateral right to “take by purchase” by insisting that the Town resort to an alternative eminent domain procedure which, even under the Charter, requires “just compensation.” Aquarion contends that, although Oxford Water Co. provided a relatively straightforward formula for determining “actual cost” in the particular context of a taking by purchase, the decision did not address whether this formula satisfied the requirement of just compensation in the context of a taking by eminent domain.
Braintree Water Supply Co. v. Braintree, 146 Mass. 482 (1888), is instructive. There, the relevant charter, St. 1886, c. 269, §10, provided that the town “shall have the right, at any time during the continuance of the charter hereby granted, to purchase the franchise, corporate property, and all the rights and privileges of said corporation.” Id. at 485. The SJC observed that any distinction between whether the town was making an offer to purchase or instead taking by eminent domain was irrelevant.
Whether the town, in voting to buy, was merely making an offer, or whether it was exercising the right of eminent domain, is immaterial. For, if it was an offer, it was accepted by the company, and a valid contract existed, to the performance of which the town is bound; and, if it was the exercise of the right of eminent domain, rights thereupon vested in the company which entitle it to maintain this petition. The petition alleges that the company informed the committee of the town that it would accept the agreement of the town to buy, and that it would sell to the town . . . The more reasonable *405 construction of the statute is that it authorized the town to take the properly of the company by the exercise of the right of eminent domain, and that the term ‘to purchase’ was used in that sense. This is evidently the construction put upon it by the town and its officials, and by the company . . . There is no provision in the statute implying that the company has any option in the matter. The statute authorizes the doing of an important public work which is ordinarily done by the municipality itself. It is not to be supposed that the legislature intended that the private wishes or interests of a private corporation should prevent the town from assuming this work.

Id.

Several years later, faced with a similar charter giving a town “the right to take [the plaintiff water company], by purchase or otherwise,” the SJC observed that the company, “by the very terms of its creation, is subject to compulsory purchase, and . . . there is no question of the constitutionality of a proceeding in accordance with the charter which the plaintiff was content to accept.” Rockport Water Co. v. Rockport, 161 Mass. 279, 279 (1894).
In Cohasset Water Co. v. Cohasset, 321 Mass. 137 (1947), the SJC confronted another charter that gave the town the unilateral right to purchase the water company at a price determined by the charter. There, the compulsory purchase provision “was designed solely to supply a means by which the town of Cohasset could exercise an option to purchase the franchise and property of the Cohasset Water Company, against the will of that company, if it did not agree, as a condition upon which that particular company was allowed to have a charter. ” Id, at 141. Instead of availing itself of G.L.c. 40, §38 (Ter. Ed.), which simply gave municipalities authority to obtain water supply from corporations by voluntary contract or purchase, the town invoked the charter. Id. In so doing, “the town chose to exercise to the fullest extent the special right conferred upon it by the company’s charter in the manner there provided, thus assuring itself of its right to purchase and availing itself of its right to have the price fixed in the manner there set forth.” Id.
With respect to the Charter at issue in this case, the SJC offered the following insight.
When property is taken by eminent domain, just or reasonable compensation must be awarded to the owner so as to restore to him, as nearly as possible, the value of the property of which he is being deprived. Here we are seeking to interpret the statute by which the proprietors of the water company acquired the franchise under which it operates. Our task, therefore, more nearly resembles interpreting a contract than determining what constitute just or reasonable compensation sufficient to justify a taking of private property under the Federal and State Constitutions.
Oxford Water Co., 391 Mass. at 591.
This Court interprets the foregoing language as an implicit ruling that, in the context of the Town’s efforts to acquire Aquarion, the SJC’s “actual cost” formula and “just or reasonable compensation” are one and the same. The above cases reinforce the notion that the special charters mimic contracts by which the companies bargained away any right to have the value of their property determined under traditional principles of just compensation.
Indeed, Aquarion’s predecessor-in-interest, Oxford Water Company, was a creature of statute whose operations existed only by the grace of the Legislature. By forming under the Charter, it agreed to abide by the Charter’s terms, which included a predetermined formula for compensation in the event that the Town exercised its unilateral right to purchase. Aquarion’s vulnerability to a forced purchase at a price below what a free market might bear is just one of the numerous risks it assumed when it acquired a chartered water company. The SJC clearly recognized that the company’s fair value could not be divorced from the unique circumstances under which it was formed, and, therefore, it is logical to infer that the SJC’s “actual cost” formula already reflects all that is owed as constitutional just compensation. See Oxford Water Co., 391 Mass. at 591. See also Rockport Water Co., 161 Mass. at 279 (“[T]here is no question of the constitutionality of a proceeding in accordance with the charter which the plaintiff was content to accept”).[2]
In sum, Aquarion may not rely on a distinction between a taking by purchase and a taking by eminent domain as grounds for revisiting the SJC’s decision in Oxford Water Co. If there is, indeed, some merit to Aquarion’s argument that the SJC’s 1984 formula is outdated or otherwise flawed, it is not this Court’s place to declare it. See Commonwealth v. Runyan, 456 Mass. 230, 234 (2010), quoting Rodriguez de Ouijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989) (“If a precedent of this court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this court the prerogative of overruling its own decisions”).
Along the same vein, this Court concludes that the “actual cost” formula in Oxford Water Co. includes not only tangible property, but also “franchise, . . . rights and privileges.” 391 Mass. at 593. This conclusion is consistent not only with the plain text of the decision, which does not distinguish between tangible and intangible assets, see id., but also with the Legislature’s intent that the formula “be easily and accurately calculable.” Id. at 589. To the extent that Aquarion takes issue with the SJC’s alleged failure to consider the value of its predecessor’s “franchise” or “rights and *406 privileges,” that argument is more appropriately addressed to the higher court.
2. Cumulative versus annual return on stockholder investment
Although Aquarion would have this Court venture outside the Charter’s “actual cost” provision to determine just- compensation for the water supply system, it urges strict adherence to the Charter’s provision for a 5% per annum net return on stockholder investment.
The Charter provides in pertinent part, “(U]nless the dividends earned and declared by said company on its stock shall be equal to or in excess of five per cent per annum there shall be added to the first cost such a sum as will make the net return to the stockholders five per cent per annum on the investment.” St. 1904, c. 193, §9.
Under Oxford Water Co., “investment” is defined as “the amount the stockholders paid into the company for the capital stock plus earnings retained by the company.” 391 Mass. at 591. This Court is bound by that definition and sees no need to elaborate further at this time. Insofar as the Town challenges Aquarion’s proof of “earnings retained by the company,” that is an evidentiary issue that is not appropriate for declaratory judgment.
The Town argues that the 5% provision requires the Town to pay a cumulative net return of 5% on stockholder investment, with an offset for years in which the stockholders received dividends that provided a return greater than 5%. Aquarion submits that the Town must disregard any years in which stockholders received more than 5% on their investments (as the Charter establishes a floor, not a ceiling), and must pay the difference in any years in which the return fell short of 5%, as well as accrued interest on any such shortfalls from the date on which the shortfall arose.
Aquarion contends that the Town’s interpretation defies the Legislature’s intent by arbitrarily limiting stockholders’ annual return to 5%. By using the term “per annum” twice in the Charter, Aquarion argues, the Legislature intended to guarantee stockholders at least a 5% return in each individual year.
While Aquarion focuses on the term “per annum” to support its year-to-year approach, the Town focuses on the term “net return” (emphasis added) to suggest that the Legislature contemplated an aggregate approach that uses “per annum” not as a guarantee of a 5% or greater return for each year of the company’s existence, but rather as a guarantee of a sum that represents an average of 5% per year when spread out over the life of the investment.
The Town’s Manager, Joseph M. Zeneski, attached to his nine-volume affidavit two documents purporting to show the dividend payment history for Aquarion and its predecessors, from 1906 through 2009. See Zeneski Aff., Vol. 9, Exhs. M&N. The Court does not rule on the admissibility or accuracy of the documents; rather, it refers to them only to illustrate the parties’ respective arguments.[3]
Under Zeneski’s model, because Aquarion and its predecessors yielded returns greater than 5% per annum on average, the Town is not required to pay any added cost. See St. 1904, c. 193, §9; Oxford Water Co., 391 Mass. at 592.
Under Aquarion’s model, not only is the Charter’s added cost requirement triggered despite the greater - than-5% average annual return, but the Town is also required to make up for the shortfalls in each individual year in which the return did not reach 5%, with interest accruing from those years.
There are significant practical concerns with implementing Aquarion’s model. Even though the Charter does not impose a cap on the company’s returns in any given year, Aquarion’s interpretation lends itself to potential manipulation by the company’s directors to ensure a “bonus” in the event of a forced sale. To borrow an example, the dividend payment chart at Exhibit N reflects that, for the years 1988-1990, the company paid a negligible amount of dividends on preferred stock and did not pay any dividends on common stock. Even though the company paid dividends far in excess of 5% in each year thereafter, securing for its stockholders a lucrative net return on their investment, Aquarion would hold the Town accountable for the amounts by which the dividend payments fell short of 5% in 1988, 1989, and 1990.
Although the Court does not suggest that Aquarion manipulated its finances in any way, one can envision a scenario in which the company enjoys a sufficient surplus each year to pay dividends in excess of 5%, but instead elects to defer payment on those dividends for several years, expecting the Town to pay a 5% “bonus" for the artificial shortfalls if and when it opts to purchase the company. This sort of financial uncertainly and susceptibility to creative bookkeeping cannot be what the Legislature intended when it reserved for the Town the right to take over what is typically a public function. Compare Braintree Water Supply Co., 146 Mass. at 485 (“The statute authorizes the doing of an important public work which is ordinarily done by the municipality itself. It is not to be supposed that the legislature intended that the private wishes or interests of a private corporation should prevent the town from assuming this work”).
Consistent with the Legislature’s dual aims of ensuring that the stockholders obtain a “fair return on their investment” and that the Town’s right to purchase be based on an “easily and accurately calculable” formula, Oxford Water Co., 391 Mass. at 589, 592, the Court concludes that the 5% net return provision is cumulative. Therefore, to the extent that the company’s total dividend payments from 1906 to 2009 were greater than or equal to a 5% average annual *407 return, Aquarion is not entitled to added cost under the Charter.
3. Time Value Adjustment
Although Aquarion contests the admissibility of the Town’s dividend payment charts and the conclusions drawn therefrom, it has not directed the Court to any evidence that suggests that the cumulative return was less than 5% over the life of the investments. In light of the Court’s conclusion that Aquarion is not entitled to payment for “added cost” if the average annual return on investment was greater than or equal to 5%, the Court need not determine whether such payments should be adjusted to reflect their true value in present-day dollars.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Town’s Motion for Partial Summary Judgment be ALLOWED only as to so much of the Motion as seeks declarations that:
(1) the “actual cost” of Aquarion’s franchise, property, rights and privileges must be calculated in accordance with the formula set forth in Oxford v. Oxford Water Co. 391 Mass. 581 (1984): and
(2) the Charter’s 5% per annum provision provides for a cumulative 5% return, rather than an annual calculation, and permits an offset for each year in which the company’s dividend payments exceeded 5%.
The Town’s Motion is otherwise DENIED.
It is further ORDERED that Aquarion’s Motion for Partial Summary Judgment be DENIED.

Tfyhe Town seeks declarations that certain itemized costs are not includible in the “actual cost” calculation. See Oxford’s Motion for Partial Summary Judgment, p. 2. The Court will not attempt to parse these items until the broader question of whether Oxford Water Co. controls the measure of compensation in this case has been finally resolved. Any dispute over the evidentiary value of Aquarion’s submissions may be addressed once a definitive framework is in place.

T'he Charter’s provision that “the taking, if by exercise of the right of eminent domain, shall be by filing in the registry of deeds ... a declaration of such taking . . .” lends some credence to Aquarion’s contention that the Legislature intended to mark a clear distinction between a taking by purchase and a taking by eminent domain. St. 1904, c. 193, §9. Ultimately, however, nothing in the Charter’s language permits Aquarion to force the Town into an eminent domain framework by refusing to sell.

Aquarion’s Response to Oxford’s Statement of Undisputed Material Facts suggests that the net return to stockholders fell short of the 5% per annum requirement by $9,832,051, but Aquarion does not cite to anything in the record to support its assertion. See Aquarion’s Response, Joint Statement of Material Facts in Support of Oxford’s Motion for Partial Summary Judgment, p. 64, par. 177. While the Court is not constrained to accept the Town’s dividend payment charts at face value, Rule 9A(b)(5) exists to spare the Court from ferreting through the vast summary judgment record to ascertain the basis for Aquarion’s proposed figures.