NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11961


ISABEL KAIN & others[1]  vs.  DEPARTMENT OF ENVIRONMENTAL
PROTECTION.



Suffolk.     January 8, 2016. - May 17, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Department of Environmental Protection.  Environment, Air
     pollution.  Regulation.  Administrative Law, Regulations.
     Declaratory Relief.  Statute, Construction.




     Civil action commenced in the Superior Court Department on
August 12, 2014.

     The case was heard by Robert B. Gordon, J., on motions for
judgment on the pleadings.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Jennifer K. Rushlow (Susan J. Kraham, of New York, &
Veronica S. Eady with her) for Conservation Law Foundation &
another.
     Jo Ann Shotwell Kaplan, Assistant Attorney General, for the
defendant.
     Phelps Turner & C. Dylan Sanders, for Isabel Kain & others,
were present but did not argue.

---

[1] Shamus Miller, James Coakley, Olivia Gieger, Conservation
Law Foundation, and Mass Energy Consumers Alliance.

The following submitted briefs for amici curiae:
Stephanie R. Parker for Clean Water Action & others.
Edward J. DeWitt for Association to Preserve Cape Cod.
Arthur P. Kreiger & Jessica A. Wall for William R. Moomaw & others.
Robert J. Muldoon, Jr., & Thomas Paul Gorman for David A. Wirth.

CORDY, J.   In this case, we are asked to decide whether the Department of Environmental Protection (department) has fulfilled its statutory mandate under G. L. c. 21N, § 3 (d) (§ 3 [d]), which provides that the department "shall promulgate regulations establishing a desired level of declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions."  By the terms of the enabling legislation, the Global Warming Solutions Act, St. 2008, c. 298 (act), these regulations were to be issued by January 1, 2012, to take effect on January 1, 2013, and to expire on December 31, 2020.  See St. 2008, c. 298, § 16.  The department failed to take action by the statutory deadline, and in November, 2012, a group of residents submitted a rulemaking petition to the department seeking the issuance of regulations pursuant to § 3 (d) to limit greenhouse gas emissions[2] in the Commonwealth.

The department held a public hearing on June 13, 2013, to consider the petition.  Shortly thereafter, it issued a written

_____

     [2] Unless otherwise indicated, we use the terms "emissions" to mean greenhouse gas emissions.

statement addressing the petitioners' concerns and concluding that it had complied with the requirements of the act, including those set forth in § 3 (d). The statement also referenced specific regulatory schemes that the department had established to reduce greenhouse gases, including prescribed limits on sulfur hexafluoride leaks, a regional cap and trade market to manage carbon dioxide emissions known as the Regional Greenhouse Gas Initiative (RGGI), and a low emission vehicle (LEV) program aimed at reducing automobile emissions. The department further stated that these initiatives, individually and in combination, fulfilled the mandate of § 3 (d). No further action was taken by the department at that time.

In August, 2014, the plaintiffs filed a complaint in the Superior Court seeking declaratory relief, or in the alternative, a writ of mandamus, on the grounds that the department had failed to fulfil its statutory mandate under § 3 (d). The parties agreed that their respective submissions to the court could be treated as cross-motions for judgment on the pleadings under Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974). The department again took the position that the sulfur hexafluoride, RGGI, and LEV regulations satisfy the mandate of § 3 (d). Following a hearing in March, 2015, the judge dismissed the plaintiffs' mandamus claim and entered judgment in the department's favor based on his findings that the three

regulatory initiatives cited by the department substantially complied with the requirements of § 3 (d). The plaintiffs timely appealed, and we granted direct appellate review to determine whether the department has met its obligations under § 3 (d).

For the reasons discussed herein, we conclude that the unambiguous language of § 3 (d) requires the department to promulgate regulations that establish volumetric limits on multiple greenhouse gas emissions sources, expressed in carbon dioxide equivalents, and that such limits must decline on an annual basis. We further conclude that the sulfur hexafluoride, RGGI, and LEV regulations fall short of complying with the requirements of § 3 (d), because they fail to ensure the type of mass-based reductions in greenhouse gases across the sources or categories of sources regulated under each of the programs, as intended by the Legislature. Accordingly, we reverse the judgment of the Superior Court.[3]

Discussion. This case was decided in the Superior Court on the parties' cross motions for judgment on the pleadings. See Mass. R. Civ. P. 12 (c). For the purposes of this appeal, we

---

[3] We acknowledge the amicus briefs submitted by the Association to Preserve Cape Cod; Clean Water Action, Environmental League of Massachusetts, Massachusetts Climate Action Network, Massachusetts Sierra Club, Mothers Out Front & others; Alternatives for Community and the Environment, the town of Duxbury, & Dr. William R. Moomaw; and David A. Wirth.

assume to be true the allegations in the plaintiffs' complaint and the exhibits attached thereto. See Sliney v. Previte, 473 Mass. 283, 284 (2015).

The plaintiffs sought a declaratory judgment, or in the alternative, a writ of mandamus. A party may seek a declaratory judgment "in any case in which an actual controversy has arisen." G. L. c. 231A, § 1. We interpret the "actual controversy" requirement generously. See Gay & Lesbian Advocates & Defenders v. Attorney Gen., 436 Mass. 132, 134 (2002). "[A] dispute over an official interpretation of a statute constitutes a justiciable controversy for purposes of declaratory relief." Santana v. Registrars of Voters of Worcester, 384 Mass. 487, 493 (1981), S.C., 390 Mass. 358 (1983). Declaratory judgment is appropriate here because the material facts are not disputed, and the plaintiffs challenge only the department's interpretation of G. L. c. 21N, § 3 (d).[4] Moreover, we previously have recognized that "declaratory relief may sometimes be necessary to ensure that an agency will fulfil

---

[4] The plaintiffs also requested a writ of mandamus to compel department to promulgate regulations that comply with G. L. c. 21N, § 3 (d) (§ 3 [d]). Mandamus is an extraordinary remedy reserved for circumstances where the court must "prevent a failure of justice in instances where no other relief is available." Service Employees Int'l Union, Local 509 v. Department of Mental Health, 469 Mass. 323, 334, n.11 (2014). Because declaratory relief is available in this case, mandamus relief is not appropriate.

its statutory mandate."  Smith v. Commissioner of Transitional Assistance, 431 Mass. 638, 651 (2000).

1.  Statutory framework.  We begin with an overview of § 6 of the act, which enacted the Climate Protection and Green Economy Act, G. L. c. 21N (statute).  The act was developed against the backdrop of an emerging consensus shared by a majority of the scientific community that climate change is attributable to increased emissions, as well as perceptions in the Commonwealth that national and international efforts to reduce those emissions are inadequate.  See Executive Office of Energy & Environmental Affairs, Massachusetts Clean Energy and Climate Plan for 2020 at 8 (Dec. 29, 2010); Executive Office of Energy & Environmental Affairs, Determination of Greenhouse Gas Emission Limit for 2020 at 1 (Dec. 28, 2010) (Secretary's Determination).  See also Massachusetts v. Environmental Protection Agency, 549 U.S. 497, 505 (2007) (petition by Massachusetts, with other States, local governments, and private organizations, arguing Environmental Protection Agency abdicated responsibility under Clean Air Act to regulate emissions of four greenhouse gases, including carbon dioxide).[5]  The act

---

[5] See Environmental Protection Agency, Regulating Greenhouse Gas Emissions under the Clean Air Act, 73 Fed. Reg. 44,355 (Jul. 30, 2008), in which the Administrator of the Environmental Protection Agency (EPA) stated that the "Clean Air Act, an outdated law originally enacted to control regional pollutants

established a comprehensive framework to address the effects of climate change in the Commonwealth by reducing emissions to levels that scientific evidence had suggested were needed to avoid the most damaging impacts of climate change. Executive Office of Energy & Environmental Affairs, Commonwealth of Massachusetts Global Warming Solutions Act 5-Year Progress Report at 17 (Dec. 30, 2013) (Progress Report). In accordance with these findings, the statute requires that, by 2050, greenhouse gas emissions be reduced by at least eighty per cent below 1990 levels. G. L. c. 21N, § 3 (b).

The same year that the act became law, the Legislature also enacted companion legislation concerning "Green Communities," St. 2008, c. 169; "Oceans," St. 2008, c. 114; "Clean Energy Biofuels," St. 2008, c. 206; and "Green Jobs," St. 2008, c. 307. "Each act addresses a separate but related piece of the clean energy economy." See Report of the Senate Committee on Global Warming and Climate Change, No Time to Waste, at 10 (Feb. 13, 2015). The act and its companion statutes provide policymakers with a broad array of tools, including "targeted and technology-specific policies[,] . . . economy-wide and market-based mechanisms," and renewable energy portfolio standards and energy efficiency improvements, to advance a clean energy economy while

---

that cause direct health effects, is ill-suited for the task of regulating global greenhouse gases."

reducing emissions and addressing the unique threats that climate change poses to the Commonwealth. See Massachusetts Clean Energy and Climate Plan for 2020, supra, Executive Summary at 7.

The act is one of the primary mechanisms for achieving reductions in emissions, and is the sole piece of legislation authorizing the establishment of legally binding limits on those emissions in the Commonwealth.[6] Secretary's Determination at 1. The act represents a commitment by the Commonwealth "to the most ambitious greenhouse gas reductions for a single state in the entire country." Progress Report at introductory letter from the Secretary. To ensure that the Commonwealth remains on track to meet the reduction limit for 2050, the statute also includes timelines for achieving specified benchmarks in greenhouse gas reductions in 2020, 2030, and 2040. G. L. c. 21N, § 3 (b).

The act designates the Secretary of Energy and Environmental Affairs (secretary) and the department as the

---

[6] By enacting the Global Warming Solutions Act (act), Massachusetts became one of three States in the United States to establish legally binding limits on Statewide greenhouse gas emissions. See Executive Office of Energy & Environmental Affairs, Global Warming Solutions Act 5-Year Progress Report at 17 (Dec. 30, 2013) (Progress Report). In 2006, California's own Global Warning Solutions Act was signed into law. See id. at 17 n.5. Massachusetts' act is based largely on California's version of the law. Compare Cal. Health & Safety Code §§ 38500-38599 (2014).

entities primarily responsible for implementing the act.[7] See generally G. L. c. 21N. The design of the act is synergistic, imposing numerous directives and timelines on the secretary and the department to perform certain duties, subject to deadlines. See St. 2008, c. 298, §§ 10-18. These duties are to be performed chronologically, and are largely contingent on one another. First, by January 1, 2009, the department was to establish a greenhouse gas reporting regime and registry, which permits the secretary to measure compliance with greenhouse gas emissions reduction efforts. See G. L. c. 21N, § 2 (a)-(c); St. 2008, c. 298, § 10. Second, by July 1, 2009, the department was to determine a baseline emissions level equal to the sum of all emissions from Commonwealth sources for calendar year 1990 and "reasonably project" what the emissions level would be in calendar year 2020 "if no measures are imposed to lower emissions other than those formally adopted and implemented as of January 1, 2009" (known as business as usual level). See G. L. c. 21N, § 3 (a); St. 2008, c. 298, § 14. Next, the secretary was required, by January 1, 2011, in consultation with the department and the Department of Energy Resources, to a adopt Statewide emission limit for 2020 using the "business as

---

[7] The Secretary of Energy and Environmental Affairs (secretary) oversees the Commonwealth's six environmental, natural resource, and energy regulatory agencies, including the Department of Environmental Protection (department). See G. L. c. 21A, §§ 1, 7.

usual" baseline.[8]  See G. L. c. 21N, § 3 (b); St. 2008, c. 298, § 15.  Additionally, by the same date, the secretary was required to adopt a limit for 2020 that was between ten and twenty-five per cent below the 1990 emissions level, as well as a plan for achieving said reduction.  See G. L. c. 21N, §§ 3 (b)(1), 4 (a); St. 2008, c. 298, § 15.  Next, by January 1, 2012, the department was to promulgate regulations pursuant to § 3 (d) "establishing a desired level of declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions."[9]  See St. 2008, c. 298, § 16.  These regulations were to take effect on January 1, 2013.  Id.

---

[8] As noted, G. L. c. 21N (statute) also requires the secretary to adopt interim emissions levels for 2030, 2040, and 2050.  G. L. c. 21N, § 3 (b).  The emissions level for 2050 must be set at least eighty per cent below the 1990 baseline.  Id.

[9] A "[g]reenhouse gas emissions source" is any "source, or categories of sources, of greenhouse gas emissions with emissions that are at a level of significance, as determined by the secretary, that its participation in the program established under this chapter will enable the secretary to effectively reduce greenhouse gas emissions and monitor compliance with the [S]tatewide greenhouse gas emissions limit."  G. L. c. 21N, § 1.

The department contends that the phrase "category of sources" is not defined in the statute.  To the contrary, the phrase "sources or category of sources" is part of the definition of "greenhouse gas emissions source" and plainly refers to a source of greenhouse gas emissions.

"Sources or category of sources" is a term of art in environmental law, and refers to the process by which regulators sometimes devise categories or subcategories of sources to ensure that rules are implemented fairly and rationally as they apply to a regulated source of greenhouse gas emissions.  See,

It is undisputed by the parties that the department met each of the statutory deadlines, except for the deadline for promulgating the § 3 (d) regulations. The department promulgated initial emission reporting regulations in December, 2008, see 310 Code Mass. Regs. 7.71 (2013), and amended the reporting requirements of the regulations in June, 2009, to address reporting by sellers of retail electricity. See Progress Report at 18. In July, 2009, the department published a report establishing a 1990 baseline and projection of Statewide greenhouse gas emissions for a likely "business-as-usual" case to 2020. Id. In December, 2010, the secretary set a Statewide limit on greenhouse gas emissions of twenty-five per cent below the 1990 levels by 2020. Id. See Secretary's Determination at 1. At the same time, the secretary released the comprehensive Massachusetts Clean Energy and Climate Plan for 2020, discussed supra, in which he identified major sources of greenhouse gases that should be addressed as part of the plan

e.g., 42 U.S.C. § 7412(e)(2) (1999) ("In determining priorities for promulgating standards under subsection (d) of this section, the Administrator shall consider . . . (C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used"). The EPA has often devised subcategories. See, e.g., 61 Fed. Reg. 27132 (May 30, 1996) (printing and publishing); 61 Fed. Reg. 46906 (Sept. 5, 1996) (polymers and resins); 61 Fed. Reg. 48208 (Sept. 12, 1996) (polymers and resins); 62 Fed. Reg. 49052 (Sept. 18, 1997) (steel pickling); 63 Fed. Reg. 18504 (April 15, 1998) (pulp and paper); 64 Fed. Reg. 27450 (May 20, 1999) (ferroalloys); 64 Fed. Reg. 57572 (Oct. 26, 1999) (publicly owned treatment works); 67 Fed. Reg. 9156 (Feb. 27, 2002) (leather finishing).

to reduce emissions.  See Progress Report at 18.  The secretary's determination of the limit for 2020 was based on analysis by the staff of the agencies under the secretary's purview pursuant to the requirements of the statute, information and reports gathered from the Climate Protection and Green Economy Advisory Committee (established by the secretary), public hearings, and written public comments.  Secretary's Determination at 3-4.  His determination also took into account that actions taken under other statutory mandates were expected to produce Statewide greenhouse gas emissions reductions of about eighteen per cent below 1990 levels.  Id.  See Eastern Research Group Final Report to the Climate Protections & Green Economy Advisory Committee, Initial Estimates of Emissions Reductions from Existing Policies Related to Reducing Greenhouse Gas Emissions, 2, 4, 6 (April 30, 2010) (Final Report), available at http://www.mass.gov/eea/docs/dep/air/climate/ergrptf.pdf [https://perma.cc/8Q47-NGSA].  This eighteen per cent calculation accounted for reductions associated with the LEV program and the RGGI.  See Final Report at 2, 4, 6.

Thus, to reach the twenty-five per cent reduction level by 2020, the Commonwealth would have to implement additional measures to achieve approximately seven per cent in further emissions reductions.  The parties agree that these reductions

need not be attributable solely to regulations passed pursuant to § 3 (d), but rather recognize that a variety of policies and programs, including actions taken under other statutory programs, such as the Green Communities Act, G. L. c. 7, § 9A, may produce measurable reductions.  Secretary's Determination at 5.

2.  Statutory language.  General Laws c. 21N, § 3 (d), states that "[t]he department shall promulgate regulations establishing a desired level of declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions."  The plaintiffs interpret the provision to require the promulgation of regulations that address multiple sources or categories of sources of emissions, impose a limit on emissions that may be released, limit the aggregate emissions released, set emission limits for each year, and set limits that decline on an annual basis.  They also claim that the regulatory initiatives cited by the department fail to comply with the requirements of § 3 (d).  The department counters that § 3 (d) requires it only to establish aspirational targets, or in the alternative, that it has substantially complied with the mandate of § 3 (d) through its promulgation of

the sulfur hexafluoride regulations and its amendments to the RGGI and LEV regulatory schemes.[10]

We review de novo questions concerning the meaning of an agency's enabling statute. See Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006). Where the words in a statute are "clear and unambiguous," we them effect as "the legislature's expressed intent." Providence & Worcester R.R. v. Energy Facilities Siting Board, 453 Mass. 135, 141 (2009). If we conclude, however, that the statutory language is "sufficiently ambiguous to support multiple, rational interpretations," Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 186 (2009), then "we look to the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (citations and quotations omitted). Entergy Nuclear Generation Co. v. Department of Envt'l Protection, 459 Mass. 319, 329 (2011).

The department has "a wide range of discretion in establishing the parameters of its authority pursuant to the

---

[10] The department, in its brief, argues that § 3 (d) does not require the creation of entirely new regulatory programs, but rather that the department's amendments to existing programs can satisfy the mandate of § 3 (d). We need not decide whether an agency can comply with a statutory mandate to promulgate regulations by referring to existing regulations, because we conclude that none of the programs cited to by the department complies with the requirements of § 3 (d).

enabling legislation."  Moot v. Department of Envt'l Protection, 448 Mass. 340, 346 (2007), S.C., 456 Mass. 309 (2010), quoting Levy v. Board of Registration & Discipline in Med., 378 Mass. 519, 525 (1979).  Nonetheless, statutory interpretation is ultimately the duty of the courts, and for that reason, the "principle of according weight to an agency's discretion . . . is one of deference, not abdication, and this court will not hesitate to overrule agency interpretations of statutes or rules when those interpretations are arbitrary or unreasonable" (citations and quotations omitted).  Moot, supra at 346.

Moreover, our interpretation of statutes is not restricted to determining only their "simple, literal or strict verbal meaning" but also considers their "development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part . . . ." Oxford v. Oxford Water Co., 391 Mass. 581, 588 (1984), quoting Commonwealth v. Welosky, 276 Mass. 398, 401 (1931), cert. denied, 284 U.S. 684 (1932).

Taking these considerations together, we conclude that the language of § 3 (d) is unambiguous, and, as detailed throughout this opinion, we reject the department's interpretation of the provision, which would tend to undermine the act's central purpose of reducing emissions in the Commonwealth.

a.  _Limits versus targets_.  Because the question whether § 3 (d) requires the department to promulgate regulations establishing binding limits on emissions or merely aspirational targets is central to our determination of whether the agency has met its obligations under the statute, we begin our construction of the provision with the meaning of the word "emission limits" as it appears in § 3 (d).  The plaintiffs contend that the phrase "emission limits" requires the department to issue regulations that establish binding caps on sources or categories of sources of emissions; the department argues that the phrase, as used in § 3 (d), requires it only to promulgate regulations that establish aspirational goals or unenforceable targets because the phrase is modified by the phrase "desired level."

With respect to this point, we are guided by two well-established principles of statutory construction.  First, where the same word is used in different parts of a statute, it "should be given the same meaning . . . barring some plain contrary indication."  CFM Buckley/North LLC v. Assessors of Greenfield, 453 Mass. 404, 408 (2009), quoting Connolly v. Division of Pub. Employee Retirement Admin., 415 Mass. 800, 802-803 (1993).  Second, "[a]ll the words of a statute are to be given their ordinary and usual meaning" and we construe "each clause or phrase . . . with reference to every other clause or

phrase without giving undue emphasis to any one group of words, so that, if reasonably possible, all parts shall be construed as consistent with each other so as to form a harmonious enactment effectual to accomplish its manifest purpose." Worcester v. College Hill Props., LLC, 465 Mass. 134, 139 (2013), quoting Selectmen of Topsfield v. State Racing Comm'n, 324 Mass. 309, 312-313 (1949).

Applying these canons of interpretation, the parties agree that the emissions reduction levels established by G. L. c. 21N, §§ 3 (b) and 4 (a), are legally binding "[g]reenhouse gas emission limits" as defined in § 1.[11]  See Secretary's Determination at 1.  Despite this, the department asserts that because § 3 (d) uses the term "emission limits" rather than the statutorily defined term "greenhouse gas emissions limit," that term is inapplicable to § 3 (d), and accordingly, regulations promulgated thereunder need not set binding caps on emissions. We disagree.  This argument ignores the fact that the term "emissions limit(s)," unmodified by "greenhouse gas," appears eight times in § 3 (b) and twice in § 4 (a).  In both of these sections, however, there can be no doubt that the "emissions" referenced are greenhouse gas emissions, and not emissions of

---

[11] General Laws c. 21N, § 1, defines "[g]reenhouse gas emissions limit" as "an authorization, during a specified year, to emit up to a level of greenhouse gases specified by the secretary, expressed in tons of carbon dioxide equivalents."

some other type.  The same holds true for § 3 (d), which calls for emission limits on "sources or categories of sources that emit greenhouse gas emissions" (emphasis added).  It is apparent from the plain language that § 3 (d) refers to "greenhouse gas emissions limits" and that the term should accordingly be given its statutorily defined meaning, which calls for a volumetric cap on emissions, expressed in tons of carbon dioxide equivalents.[12]

The context in which the word "limits" appears also is instructive to our determination of whether an actual cap on emissions is required by § 3 (d).  The statute directs the department to establish "desired level[s] of . . . emissions limits" through the promulgation of regulations.  G. L. c. 21N, § 3 (d).  A regulation, by its definition, is not aspirational. See Black's Law Dictionary, 1475 (10th ed. 2014) (defining

---

[12] Because we concluded that the term "emission limits" as it appears in § 3 (d) refers to the statutorily defined term greenhouse gas emissions limits, we reject the department's contention that the statutory requirement that limits be expressed in carbon dioxide equivalents applies only to "Statewide greenhouse gas emissions." G. L. c. 21N, § 1. This argument ignores the definition of "greenhouse gas emissions limit," which, by definition must also be expressed in carbon dioxide equivalents.  See note 11, supra. Moreover, the department offers no reason why it cannot express limits in carbon dioxide equivalents, which is how emissions reductions are measured and reported in reports related to progress in meeting the act's goals.  See, e.g., Executive Office of Energy & Environmental Affairs, Massachusetts Clean Energy and Climate Plan for 2020, Executive Summary at 6 (Dec. 29, 2010); Progress Report at 4, 12.

"regulation" as "[c]ontrol over something by rule or restriction . . ."). It is doubtful that the Legislature would require the promulgation of regulations had it only meant for the department to set aspirational targets, and if that was its intention, it could have used the word "target" or "goal."[13] Given this, we see no indication that the Legislature intended to distinguish between the term "emission limits" in § 3 (d) and its meaning as defined in § 1 of the statute and as it is used in §§ 3 (b) and 4 (a).

Second, giving the word "desired" its ordinary meaning, we reject the department's position that the Legislature's use of the word evinces its intent for the department to establish target emissions levels rather than legally binding limits as inconsistent with the manifest purpose of the statute. Although it is true that the word "desired" can mean "that is longed or hoped for," the term is also defined as "predetermined to be suitable or satisfactory; prescribed as requisite." Webster's Third New International Dictionary 612 (2002). Taking this definition together with the act's central aim of reducing emissions in the Commonwealth, as well as the language of G. L.

---

[13] The Legislature also could have used the statutorily defined term "[e]missions reduction measures," which refers to "programs, measures, standards, and alternative compliance mechanisms authorized pursuant to this chapter, applicable to sources or categories of sources that are designed to reduce emissions of greenhouse gases." G. L. c. 21N, § 1.

c. 21N, §§ 3 and 4, it is apparent that the Legislature ascribed the latter meaning to the word "desired." This interpretation accounts for the fact that the Legislature, at the time it enacted the statute, knew only that the emissions limit for 2020 would be set between ten and twenty-five per cent below the 1990 emissions level. See G. L. c. 21N, §§ 3 (b), 4 (a). Thus, by using the word "desired" to modify "level," the Legislature intended for the department to establish emission limits by sources or categories of sources, and left it to the department to determine what those limits would need to be to achieve the compulsory reductions set by the secretary in accord with §§ 3 (b) and 4 (a).

The statutory deadline for promulgating regulations pursuant to § 3 (d) lends further support to our interpretation of the phrase "desired levels," especially in conjunction with the statutory timeline, which required the department to promulgate regulations after the creation of the greenhouse gas emissions registry, the determination of the limit for 2020, and the publication of the Secretary's plan for achieving the limit for 2020, all of which would need to be considered in determining both what sources of greenhouse gases to regulate, as well as what emissions limits would be required with respect

to those sources to achieve the reduction limit for 2020.[14]  A
"clearer statement is difficult to imagine" (citations omitted).
Attorney Gen. v. Commissioner of Ins., 450 Mass. 311, 319
(2008).  We thus conclude that the plain language of the statute
requires the department set actual limits for sources or
categories of sources that emit greenhouse gases through the
promulgation of regulations.

b.  Remaining language.  We next examine the remaining
language of § 3 (d) and what it means for the department to
adopt "regulations establishing . . . declining annual aggregate
emission limits for sources or categories of sources that emit
greenhouse gas emissions."  G. L. c. 21, § 3 (d).

The plaintiffs contend that the statute, by its terms,
requires the department to promulgate regulations that address
multiple sources or categories of sources of emissions, impose a
limit on emissions that may be released, limit the aggregate
emissions released from sources regulated by the department
pursuant to § 3 (d), set emissions limits for each year and

---

[14] The department also argues that the sunset provision
associated with the § 3 (d) regulations supports its position
that the Legislature did not intend for actual limits on
emissions to be established under the provision.  A more
sensible reading is that the sunset provision exists because
after 2020, new annual limitations on emissions would have to be
issued to ensure that Statewide limit for 2030, which has yet to
be established, will be met.  In any event, the department's
interpretation of the sunset provision as meaning it cannot set
any limits under § 3 (d) would render the entire provision
meaningless, and is therefore not entitled to deference.

establish limits that decline on an annual basis. The department disagrees, and argues that § 3 (d) only addresses source-specific emissions and does not require the establishment of Statewide emission limits by source category, which would effectively limit the number of sources of greenhouse gases in the Commonwealth, and not just emissions from those sources. Although either approach might prove successful in reaching the Commonwealth's over-all reduction goal, our obligation is to determine which of these approaches the Legislature intended in enacting § 3 (d).

We begin by observing that the words "regulations," "emission limits," and "sources or categories of sources" appear in their plural form in § 3 (d). From this usage we may infer that the Legislature intended for the department to regulate multiple sources of greenhouse gas emissions. See Leopoldstadt, Inc. v. Commissioner of Div. of Health Care Fin. & Policy, 436 Mass. 80, 86-87 (2002) (court gives meaning to Legislature's affirmative use of singular or plural form). We therefore reject the department's argument that each of the three regulatory schemes individually satisfies the mandate of § 3 (d), as the plain language of the statute requires the regulation of multiple groups of sources. The central purpose of the act is to effect significant reductions in emissions in the Commonwealth, and that purpose would be frustrated if the

department were to regulate emissions from only one group of sources or categories of sources. We therefore conclude that the plain language of § 3 (d) requires the department to regulate not all, but multiple, sources that emit greenhouse gases.

We next consider the meaning of the phrase "declining annual aggregate emission limits for sources or categories of sources." The terms "emission limits" and "sources or categories of sources" derive from the definitional section of c. 21N. Because the term "aggregate" is not defined in the statute, however, we look to its ordinary meaning: "formed by the collection of units or particles into a body, mass, or amount: collective." Webster's Third New International Dictionary 41 (2002).

In this case, however, our interpretation hinges not on the literal meaning of the word aggregate, but on the word or phrase to which it applies. Put differently, the question is whether the plural usage of "aggregate emission limits" modifies sources to be regulated, and requires that the emission limits imposed on specified sources of emissions decline on an annual basis, or whether, as the plaintiffs posit, it obliges the department to establish annual Statewide caps on emissions in the years leading up to 2020, which would result in the establishment of a set of declining annual "aggregate emission limits."

Here, the plain language of the statute supports the former interpretation, as there is nothing in the statutory language to indicate that the department must regulate every source of emissions in the Commonwealth.[15]  Indeed, plaintiffs acknowledge that the department has discretion to select what sources of emissions it will regulate pursuant to § 3 (d).[16]  Moreover, we are cognizant of the fact that not all reductions in emissions will be accomplished through the type of source-specific regulation called for by § 3 (d).  Taking these considerations together, it is evident that the phrase "aggregate emission limits" modifies "sources or categories of sources," and thus refers to the total mass of greenhouse gases emitted from each regulated group of sources or categories of sources.  Finally, it is apparent from the plain language of the statute that the

---

[15] By its language, the statute accounts for the fact that not all sources of greenhouse gases require regulation to accomplish the Statewide reductions required by the statute. See note 9, supra.

[16] Although the department has discretion to choose which sources to regulate under § 3 (d), the plaintiffs argue that, even if the department's cited regulatory initiatives complied with the provision's requirements, the department must regulate a broader array of sources, and that it must do so through a transparent decision-making process.  Although we agree that regulations contemplated under § 3 (d) are subject to the requirements of the Administrative Procedure Act, G. L. c. 30A, nothing in this opinion should be construed as requiring the department to regulate a particular number of sources or type of source.

aggregate emission limits for each regulated source or category of sources must decline on an annual basis.

Thus, we conclude that the plain language of § 3 (d) requires the department to promulgate regulations that address multiple sources or categories of sources of emissions, impose a limit on emissions that may be released, limit the aggregate emissions released from each group of regulated sources or categories of sources, set emissions limits for each year, and set limits that decline on an annual basis.  Moreover, by the design of the act, the department is well equipped to say what actual reductions in emissions sources and source categories can be achieved because it has already inventoried emissions from every source and source category of emissions in the Commonwealth pursuant to G. L. c. 21N, § 2.

Our interpretation of § 3 (d) appreciates that, although the department and the secretary have considerable expertise in addressing the challenges that climate change poses to the Commonwealth, it is ultimately for the Legislature to make fundamental policy decisions.  The act makes plain that the Commonwealth must reduce emissions and, in doing so, may, in some instances, elevate environmental goals over other considerations.  Thus, contrary to the department's assertions, the Legislature's endorsement of a variety of emission reduction

strategies[17] does not preclude our finding that § 3 (d) requires source-wide volumetric emissions limits.[18] Moreover, such a policy choice is entirely rational in pursuit of the statutory goal of achieving legally mandated emissions reductions by

---

[17] See, e.g., G. L. c. 21N, § 4 (b), which directs the secretary to

"analyze the feasibility of measures to comply with the emissions limit established in subsection (a). Such measures shall include, but not be limited to, the electric generating facility aggregate limit established pursuant to [§] 12, direct emissions reduction measures from other sectors of the economy, alternative compliance mechanisms, market-based compliance mechanisms and potential monetary and nonmonetary incentives for sources and categories of sources that the secretary finds are necessary or desirable to facilitate the achievement of reductions of greenhouse gas emissions limits."

[18] Regulations issued pursuant to § 3 (d) may be characterized as prescriptive regulations, or what are sometimes called "command and control" regulations. See EPA, National Center for Environmental Economics, Economic Incentives, available at https://yosemite.epa.gov/EE%5Cepa%5Ceed.nsf/webpages/EconomicIncentives.html [https://perma.cc/NDD8-XMFW]. Prescriptive regulations typically mandate how much pollution an individual source is allowed to emit or what type of equipment must be used to meet such requirements. EPA, Guidelines for Preparing Economic Analysis, Regulatory and Non-Regulatory Approaches to Pollution Control at 4-2 (Dec., 2010) (Pollution Control), https://yosemite.epa.gov/ee/epa/eerm.nsf/vwAN/EE-0568-04.pdf/$file/EE-0568-04.pdf [https://perma.cc/RX73-YN3W]. The department points out that such regulations often use rates as a means of prescribing emissions limitations, and that § 3 (d) should be interpreted in this manner. However, "[b]ecause a prescriptive standard is commonly defined in terms of an emissions rate, it does not directly control the aggregate emission level." Pollution Control, supra. Here, it is clear that the Legislature intended, through its unambiguous language, that the department issue prescriptive regulations that directly control emission levels.

2020.[19]  Where the Legislature has balanced public policy concerns and chosen a course of action, it is not for the court to second-guess its decision.  Wakefield Teachers Ass'n v. School Comm. of Wakefield, 431 Mass. 792, 802 (2000).

3.  Regulatory programs.  Having concluded what § 3 (d) requires, we turn to the three regulatory initiatives cited by the department as satisfying the mandate of § 3 (d).  We begin by noting that the department does not dispute that it missed the January 1, 2012, statutory deadline for promulgating regulations pursuant to § 3 (d).  Moreover, based on our interpretation of § 3 (d) as requiring declining annual aggregate limits for regulated sources or categories sources of emissions, it is apparent that the regulatory schemes on which the department relies in this case do not comport with the requirements of § 3 (d).

---

[19] See, e.g., Balmes, California's Cap-and-Trade Program, in Global Climate Change & Public Health, 383, 384 (Pinkerton & Rom, eds. 2014) (noting that direct regulations account for much larger proportion of emission reductions in California than reductions attributable to State's cap-and-trade system); Doremus & Hanemann, Of Babies and Bathwater: Why the Clean Air Act's Cooperative Federalism Framework Is Useful for Addressing Global Warming, 50 Ariz. L. Rev. 799, 799, 808 (2008) ("While [carbon] trading has a place in the policy portfolio needed to mitigate global warming, it alone will not be sufficient. . . . Therefore, a regulatory strategy that just caps emissions from electricity generating units -- such as the Regional Greenhouse Gas Initiative [RGGI] emission trading system in the northeastern states -- is unlikely to provide the scale of [greenhouse gas] reduction required to address the problem of global warming").

a.  Sulfur hexafluoride regulations.  Sulfur hexafluoride is a "greenhouse gas" within the meaning of the act.[20]  G. L. c. 21N, § 1.  The purpose of the sulfur hexafluoride regulations is to achieve reductions in emissions.  310 Code Mass. Regs. § 7.72(1) (2014).  The regulations took effect in 2015, see 310 Code Mass. Regs. § 7.72(4), and proscribe excessive leakage of sulfur hexafluoride from electrical power systems that are insulated with this gas, known as gas-insulated switchgear (GIS).  Id.

The sulfur hexafluoride regulations create a scheme in which maximum annual rates of allowable leakage for GIS in the Commonwealth decrease on an annual basis.  310 Code Mass. Regs. § 7.72(1), (4).  The department has established a calendar of decreasing rate limits, beginning with a 3.5 per cent leakage rate allowed in 2015, and ending with a 1.0 per cent leakage rate allowed in 2020.  310 Code Mass. Regs. § 7.72(5).  Any GIS manufactured after 2015 must comply with the 2020 rate of 1.0. 310 Code Mass. Regs. § 7.72(4).  The rates are calculated by dividing the total amount, in pounds, of sulfur hexafluoride gas leaked by a facility over the previous year by the total sulfur

---

[20] The EPA describes fluorinated gases like sulfur hexafluoride as "the most potent and longest lasting type of greenhouse gases emitted by human activities."  See EPA, Overview of Greenhouse Gases, Emissions of Fluorinated Gases at 1, available at http://www3.epa.gov/climatechange/ghgemissions/gases/fgases.html [https://perma.cc/NMN9-V9HT].

hexafluoride gas capacity of all GIS in the facility. 310 Code Mass. Regs. § 7.72(6)(b)(8). Failure to comply with the established rates is punishable by administrative penalties, including the imposition of a fine not to exceed $25,000 per violation. See G. L. c. 21A, § 16; G. L. c. 111, § 142A.

We agree with the plaintiffs that the imposition of declining rates falls short of complying with the requirement of § 3 (d) that regulated sources are subject to a source-wide volumetric cap on emissions.[21] A rate, by nature of being a ratio, is different from a limit, which sets a value that cannot be exceeded. Because the sulfur hexafluoride regulations impose maximum rates as opposed to maximum limits on sulfur hexafluoride emissions, an emitter permissibly could increase its sulfur hexafluoride emissions by installing additional GIS. Thus, the regulations control only the rate of leakage

---

[21] In support of the sulfur hexafluoride and LEV regulations, the department also contends that the statute, like the Federal Clean Air Act, equates "emissions limits" with "emissions limitations," permitting the expression of limits as "rates." See 42 U.S.C. § 7602(k); G. L. c. 21N, § 1. We reject this argument, as nothing in the language of the statute indicates that the Legislature intended to incorporate terms or definitions from the Clean Air Act. Although G. L. c. 21N, § 7 (d), uses the term "emissions limitation," it does so in the context of authorizing the Executive Office of Environmental Affairs to "enforce any rule, regulation, order, emissions limitation, emissions reduction measure or market-based compliance mechanism adopted by the executive office or the department pursuant to [the statute]." Contrary to the department's assertions, this provision does not say anything about how emissions limits may be expressed.

permissible, and not the collective amount of sulfur hexafluoride emissions that leak from GIS in the Commonwealth in a given year.  Although these regulations will contribute to reductions in sulfur hexafluoride emissions, they cannot ensure the type of mass-based reductions contemplated by § 3 (d).

The department argues that § 3 (d) does not require it to cap emissions levels by groups of sources, because doing so would effectively limit the number of sources of greenhouse gases in the Commonwealth, as well as emissions from those sources, rendering such regulations economically untenable, as they would prevent new or expanding sources of greenhouse gases from coming online.  To the contrary, the statute explicitly contemplates that new or expanding sources of emissions will come online in the Commonwealth.  See G. L. c. 21N, § 9 ("Nothing in this chapter shall preclude, prohibit or restrict the construction of a new facility or the expansion of an existing facility subject to regulation under this chapter, if all applicable requirements are met and the facility is in compliance with regulations adopted pursuant to [the statute]").  To the extent that emissions limits may constrain new sources from coming online in the future, such a consequence is one of legislative making.  We note, however, that existing regulatory schemes provide frameworks for how regulations can address future emissions from new or expanding sources while ensuring

that over-all emissions limits decline.[22]  Indeed, the
requirement of § 3 (d) that the aggregate mass of emissions from
a regulated group of sources be capped allows for flexibility to
create systems of allocation among sources within a category, in
contrast with a scheme that mandates stipulated reductions at a
discharge point, such as direct emissions reductions.  See G. L.
c. 21N, § 1.

b. RGGI and carbon dioxide budget trading program.  In
accordance with G. L. c. 21A, § 22, department implemented a
carbon dioxide budget trading program, which tracks the model
rules of the RGGI and applies the RGGI standards in
Massachusetts.  See 310 Code Mass. Regs. § 7.70.  The RGGI is a
cap and trade program for electricity-generating facilities,
such as power plants, that emit carbon dioxide, which is a
greenhouse gas under the statute.  See G. L. c. 21A, § 22 (a);

---

[22] See, e.g., the total maximum daily load program
established under the Clean Water Act, 33 U.S.C. § 1313(a)(1)
(2012); 40 C.F.R. § 130.2(i) (1989), which uses mechanisms such
as a "reserve capacity" to account for anticipated future
pollution.  "Offsets" provide another means of accounting for
new or expanding sources of pollution, whereby future pollution
from new or expanding sources of pollution is offset through
mitigation measures.  See, e.g., 9 Va. Admin. Code § 25-820-70
(2015) (requiring new or expanding facilities to offset
increased total discharges of nitrogen and phosphorus in
Chesapeake Bay).  The design of the RGGI also permits new or
expanding sources of greenhouse gas emissions, as it applies to
all power plants in participating States that exceed a twenty-
five megawatt capacity, whether existing or future. See Regional
Greenhouse Gas Initiative, Inc., Fact Sheet,
http://www.rggi.org/docs/Documents/RGGI_Fact_Sheet.pdf
[https://perma.cc/S5Q6-DPZ7].

G. L. c. 21N, § 1.  The RGGI established a market in which carbon dioxide emitters in the participating States can buy and sell a limited amount of emissions allowances.  See G. L. c. 21A, § 22 (b).  The program establishes a cap on the amount of carbon dioxide that power plants may emit by issuing a limited number of tradable carbon dioxide allowances.  See Regional Greenhouse Gas Initiative, Inc., Fact Sheet, http://www.rggi.org/docs/Documents/RGGI_Fact_Sheet.pdf [https://perma.cc/S5Q6-DPZ7] (Fact Sheet).  The number of allowances issued for the emission of carbon dioxide is determined by the maximum amount of carbon dioxide, measured in tons (the cap), among the nine States participating in the initiative.  Id.  The cap decreases by 2.5 per cent each year, through 2020.  Id.

Massachusetts joined the RGGI in 2007.  See Regional Greenhouse Gas Initiative Inc., Program Design Archive, http://rggi.org/design/history [https://perma.cc/MP4Z-62HX].  The Legislature subsequently required the department to adopt rules and regulations in compliance with the RGGI to "limit and reduce the total carbon dioxide emissions release by electric generating stations."  G. L. c. 21A, § 22 (b).  Accordingly, the department established the carbon dioxide budget trading program, which incorporates the RGGI scheme into its regulations and contains a schedule of the Commonwealth's annual "base

budget," which declines by the requisite 2.5 per cent each year, through 2020, when the base budget will be 12,617,227 tons of carbon dioxide. See 310 Code Mass. Regs. § 7.70(1)(a), (5)(a) (2013); See Regional Greenhouse Gas Initiative Inc., The RGGI $CO_2$ Cap, available at http://rggi.org/design/overview/cap [https://perma.cc/T6V5-ATN6].

We conclude that although the RGGI program and amendments thereto are very important to the over-all regional scheme of reducing carbon dioxide emissions, they do not qualify as a regulation under § 3 (d). The RGGI was established under G. L. c. 21A, § 22, a statute entirely separate from the act. There can be little doubt that the Legislature, which directed the department to adopt RGGI regulations in G. L. c. 21A, § 22, knew of this preexisting statutory mandate when it enacted the act and § 3 (d). Indeed, reductions from the RGGI regulation were accounted for in the eighteen per cent reduction in emissions anticipated under the "business as usual" projection calculated prior to the application of regulations under § 3 (d). See Final Report at 2. Moreover, G. L. c. 21N, § 3 (c), specifically carves out a separate process by which emissions levels and limits associated with the electric sector are established in consultation with the secretary and the Department of Energy Resources and are to take into account the

RGGI.[23]  By doing so, the Legislature recognized that a significant part of the electric sector would already be subject to regulations associated with the RGGI.  The RGGI is also addressed extensively in G. L. c. 21A, § 22, lending further support to the conclusion that the Legislature intended to treat emission reductions associated with the electric sector differently from other reductions in other sectors of the economy.

The department asks us to read the statutory provisions together, as directing the department to promulgate regulations establishing "a desired level of declining annual aggregate emission limits," G. L. c. 21N, § 3 (d), and with respect to the electric sector, "tak[e RGGI] into account," G. L. c. 21N, § 3 (c).  We disagree, as this reading ignores the Legislature's intent that regulations related to electric sector be treated differently from regulations promulgated under § 3 (d).

Moreover, even if the Legislature intended for §§ 3 (c) and 3 (d) to be construed together, the RGGI still falls short of complying with the requirements of § 3 (d) by virtue of the auction feature, which permits a regulated carbon dioxide source

---

[23] General Laws c. 21N, § 3 (c), requires that "[e]missions levels and limits associated with the electric sector shall be established by the executive office and the department, in consultation with the department of energy resources, based on consumption and purchases of electricity from the regional electric grid, taking into account the regional greenhouse gas initiative and the renewable portfolio standard."

in one State to purchase allowances from any other State to meet the compliance requirements. See Fact Sheet, supra. Under the design of the program, if a Massachusetts power plant needed to purchase allowances at the quarterly RGGI auction in order to achieve compliance, and the allowances in the Massachusetts carbon dioxide base budget were exhausted, the Massachusetts power plant could purchase allowances from another participating State. Because of this feature, there is no way to ensure mass-based reductions in carbon dioxide emissions from power plants in the Commonwealth that participate in the RGGI.[24] Thus, like the sulfur hexafluoride regulations, the RGGI may contribute to reductions in emissions, but does not comport with the specific requirements of § 3 (d). Any other interpretation would diminish § 3 (d)'s purpose of achieving measurable and permanent reductions to emissions in the Commonwealth.[25]

---

[24] Relying on data sets apparently generated from the EPA Air Markets Program Web site, the plaintiffs point out that greenhouse gas emissions from regulated entities in Rhode Island have increased under RGGI, exceeding the State budget and requiring the purchase of additional carbon dioxide allowances. EPA Air Markets Program data sets for carbon dioxide emissions under RGGI in Rhode Island in 2010 and 2011 show an increase in emissions by 87,609 short tons from 2009-2010 and 442,190 short tons from 2010-2011.

[25] Accordingly, we also reject the department's argument that regulations promulgated pursuant to § 3 (d) need not achieve greenhouse gas reductions specific to the Commonwealth, but may be regional in nature. Not only is this argument inconsistent with the statute's central purpose of reducing emissions in the Commonwealth, but it also presumes the

c. <u>Low emission vehicle program</u>. The Federal Clean Air Act establishes motor vehicle emission standards. Under the statute, however, a State may obtain a waiver of Federal preemption permitting it to adopt California's more stringent emissions standards. See 42 U.S.C. § § 7543, 7507. In 1990, Massachusetts adopted California's standards for regulating motor vehicle greenhouse gas emissions. See G. L. c. 111, § 142K, inserted by St. 1990, c. 510, § 2. That statute also required the department to establish and administer standards for motor vehicle emissions based on California's standards. G. L. c. 111, § 142K. Pursuant to that statute, the department promulgated regulations incorporating California's LEV regulatory scheme. See 310 Code Mass. Regs. § 7.40(1). See Cal. Code Regs., tit. 13, § 1961.3. The LEV regulations set exhaust and evaporative standards and regulate vehicle emissions on the basis of the fleet-wide averages of individual automobile manufacturers. 310 Code Mass. Regs. § 7.40.

We conclude that the LEV regulations do not fully comply with the mandate of § 3 (d). The original promulgation of these regulations significantly preceded the Legislature's adoption of the act. Although amendments to programs such as the LEV program certainly advance environmental goals, they do not

department has authority to promulgate regulations that have force outside the Commonwealth. Nothing in the language of the statute or of G. L. c. 21A purport to do so.

embody the change in "business as usual" required by the Legislative mandate in the act.[26]  Indeed, the fact that the Legislature was well aware of their existence and nonetheless directed the department to promulgate regulations in accord with new Statewide emissions limits is powerful evidence that neither the LEV nor the RGGI program, nor amendments thereto, satisfies the legislative intent of the act.  Although the LEV program has been amended since the adoption of the act, the amendments were made for the sole purpose of tracking exact changes to the California regulations after which it is modeled, see Cal. Code Regs., tit. 13, sec. 1961.3 (2014), which is required by the Clean Air Act.  See 42 U.S.C. §§ 7543, 7507.  It is highly

---

[26] The department also argues that, where the term "regulations" is not defined in the act, the term should have its normal meaning as reflected in the Administrative Procedure Act, G. L. c. 30A, which defines the term "regulation" to mean "the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the law enforced or administered by it."  G. L. c. 30A, § 1 (5).  Although we agree that this definition holds force, we reject the department's interpretation that the definition requires a conclusion that the LEV and RGGI programs and their amendments meet the requirements of § 3 (d).  Here, applying the literal interpretation of the definition of "regulations" would require us to ignore the over-all language and purpose of the statute, as well as the Legislature's clearly expressed intent.  We decline to interpret the meaning of regulation so strictly in this instance, where there is abundant support, in light of the language and purpose of the statute, for the conclusion that the Legislature intended for the department to regulate sources additional to those already subject to well-established regulatory schemes.

unlikely that the Legislature passed the act so that the department could promulgate regulations otherwise required by Federal law.

These considerations aside, the LEV amendments fall short of the requirements of § 3 (d) because, like the sulfur hexafluoride regulations, the LEV program regulates through the imposition of rates, rather than actual caps on emissions. The LEV regulations do not ensure reduced emissions, but instead established fixed rates of emissions from vehicles sold in Massachusetts. Thus, although the rate may remain constant or even decline, the number of vehicles sold may increase.[27] As a consequence, the LEV regulations may contribute to lower emissions from vehicles, but they cannot ensure that aggregate emissions do not increase. Therefore, they do not comply with § 3 (d).

Conclusion. Although the department's cited regulatory initiatives are important to the Commonwealth's overall scheme of reducing greenhouse gas emissions over time, they do not fulfil the specific requirements of § 3 (d). The purpose of G. L. c. 21N is to attain actual, measurable, and permanent

---

[27] The department seizes on this point to argue that the LEV regulations could only satisfy § 3 (d) if there were a cap on the number of motor vehicles sold in Massachusetts; however, the plaintiffs do not propose such a rule, and instead argue only that the LEV regulations do not meet the requirements of § 3 (d).

emissions reductions in the Commonwealth, and the Legislature included § 3 (d) in the statute to ensure that legally mandated reductions are realized by the 2020 deadline.  Accordingly, we vacate the judgment of the Superior Court and remand the matter for entry of a judgment declaring that G. L. c. 21N, § 3 (d), requires the department to promulgate regulations that address multiple sources or categories of sources of greenhouse gas emissions, impose a limit on emissions that may be released, limit the aggregate emissions released from each group of regulated sources or categories of sources, set emission limits for each year, and set limits that decline on an annual basis.

<u>So ordered</u>.