NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12477

NEW ENGLAND POWER GENERATORS ASSOCIATION, INC., & others[1]  vs.
DEPARTMENT OF ENVIRONMENTAL PROTECTION & another.[2]


Suffolk.     May 8, 2018. - September 4, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Department of Environmental Protection.  Environment, Air
     pollution.  Regulation.  Administrative Law, Regulations.
     Electricity.


     Civil action commenced in the Superior Court Department on
September 11, 2017.

     Following transfer to the Supreme Judicial Court for the
county of Suffolk, pursuant to G. L. c. 211, § 4A, the case was
reported by Budd, J.


     Seth D. Jaffe (Stephen L. Bartlett also present) for the
plaintiffs.
     Seth Schofield, Assistant Attorney General (Turner H.
Smith, Shannon S. Beale, & Joseph F. Dorfler, Assistant
Attorneys General, also present) for the defendants.

---

[1] GenOn Energy, Inc.; and Footprint Power Salem Harbor
Development LP and Massachusetts Municipal Wholesale Electric
Company, interveners.

[2] Executive Office of Energy and Environmental Affairs.

John A. DeTore, for Footprint Power Salem Harbor Development LP, was present but did not argue.

Nicholas J. Scobbo, Jr., Ann Ryan Small, & Sherry L. Vaughn, for Massachusetts Municipal Wholesale Electric Company, submitted a brief.

David K. Ismay, for Conservation Law Foundation, amicus curiae, submitted a brief.

KAFKER, J.  Its name bespeaks its ambitions.  The Global Warming Solutions Act, St. 2008, c. 298 (act), was passed to address the grave threats that climate change poses to the health, economy, and natural resources of the Commonwealth.  See Massachusetts v. Environmental Protection Agency, 549 U.S. 497, 521-522 (2007); Kain v. Department of Envtl. Protection, 474 Mass. 278, 281-282 (2016).  The act is designed to make Massachusetts a national, and even international, leader in the efforts to reduce the greenhouse gas emissions that cause climate change.  Id. at 281.  It thus establishes significant, "ambitious," legally binding, short- and long-term restrictions on those emissions.  G. L. c. 21N, §§ 3, 4.  See Executive Order No. 569 (Sept. 16, 2016).

The plaintiffs, New England Power Generators Association, Inc., and GenOn Energy, Inc., contend that a key provision, G. L. c. 21N, § 3 (d) (§ 3 [d]), which directs the Department of Environmental Protection (department) to promulgate regulations establishing declining annual aggregate emission limits for sources that emit greenhouse gas emissions, does not apply to

the electric sector, because that sector is specifically regulated by a separate provision, G. L. c. 21N, § 3 (c) (§ 3 [c]). Consequently, the plaintiffs assert that the department and the Executive Office of Energy and Environmental Affairs (executive office) (collectively, agencies) exceeded their authority in promulgating 310 Code Mass. Regs. § 7.74 (2017) (Cap Regulation),[3] which imposes declining greenhouse gas emissions limits on the in-State electric sector through 2050. Furthermore, the plaintiffs allege that the Cap Regulation will increase, rather than decrease, Statewide emissions. Lastly, the plaintiffs argue that, even if the Cap Regulation is valid, the "sunset provision" of the act prohibits additional § 3 (d) regulations after December 31, 2020. We conclude that none of these arguments is meritorious and, accordingly, uphold the Cap Regulation.[4]

1. Background. "The act was developed against the backdrop of an emerging consensus shared by a majority of the scientific community that climate change is attributable to increased [greenhouse gas] emissions, as well as perceptions in the Commonwealth that national and international efforts to

---

[3] In August, 2018, the Department of Environmental Protection (department) amended 310 Code Mass. Regs. § 7.74 (Cap Regulation). Those amendments do not affect the present case.

[4] We acknowledge the amicus brief submitted by Conservation Law Foundation.

reduce those emissions are inadequate." Kain, 474 Mass. at 281.[5]
"The act established a comprehensive framework to address the
effects of climate change in the Commonwealth by reducing
emissions to levels that scientific evidence had suggested were
needed to avoid the most damaging impacts of climate change."
Id. at 281-282.

The act's sequenced and specific design sets out interim
benchmarks to map out the course toward meeting the 2050
Statewide emissions limit goal.  First, the act directs the
department to determine the calendar year 1990 Statewide
greenhouse gas emissions level and then to project the "2020
business as usual" level -- "the statewide greenhouse gas
emissions level . . . if no measures are imposed to lower
emissions."  G. L. c. 21N, § 3 (a).[6]  Second, the act requires
that the Commonwealth reduce its Statewide greenhouse gas

[5] The Global Warming Solutions Act (act) defines "greenhouse gas" as "any chemical or physical substance that is emitted into the air and that the department may reasonably anticipate will cause or contribute to climate change including, but not limited to, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride."  G. L. c. 21N, § 1.

[6] The 1990 baseline was determined to be 94 million metric tons of carbon dioxide equivalent, of which 25.6 million was associated with electric generation.  See Department of Environmental Protection, Statewide Greenhouse Gas Emissions Level:  1990 Baseline and 2020 Business as Usual Projection, at 4 (July 1, 2009), https://www.mass.gov/files/documents/2016 /08/or/1990-2020-final.pdf [https://perma.cc/CN6Y-HGGX].  The 2020 "business as usual" projection was also estimated to be 94 million metric tons of carbon dioxide.  Id. at 5.

emissions by at least eighty per cent below the 1990 level by 2050.[7] G. L. c. 21N, § 3 (b). The act also mandates that interim Statewide emissions limits for 2020, 2030, and 2040 be adopted and accompanied by plans for implementation. Id. Third, the act requires that the executive office update its implementation plans and publish interim progress reports every five years. G. L. c. 21N, §§ 4 (h), 5. Fourth, the act directs the department to adopt regulations to require the reporting and verification of Statewide greenhouse gas emissions and to triennially publish an inventory estimating the past three years' Statewide emissions. G. L. c. 21N, § 2 (a)-(c).

The act defines "Statewide greenhouse gas emissions" as "the total annual emissions of greenhouse gases in the [C]ommonwealth," including "all emissions of greenhouse gases from the generation of electricity delivered to and consumed in the [C]ommonwealth," even if that electricity is produced elsewhere. G. L. c. 21N, § 1. Massachusetts is served by a regional electric power grid that includes six States and is interconnected with the regional grids of New York and two Canadian provinces.

Most relevant to the instant case, the act also empowers the department, in consultation with the executive office and

---

[7] The 2050 Statewide emissions limit would thus be under 19 million metric tons of carbon dioxide equivalent.

the Department of Energy Resources, to set "[e]missions levels and limits associated with the electric sector, . . . based on consumption and purchases of electricity from the regional electric grid, taking into account the regional greenhouse gas initiative and the renewable portfolio standard"[8] and directs the department to promulgate regulations establishing "declining annual aggregate emission limits for sources or categories of

---

[8] The regional greenhouse gas initiative (RGGI) is the nation's first mandatory market-based program to reduce emissions of carbon dioxide.  Participating States have established a regional cap on carbon dioxide emissions from the electric sector and require their respective in-State power plants to possess a tradable carbon dioxide allowance for each ton of carbon dioxide they emit.  The RGGI cap declines 2.5 per cent each year from 2017 to 2020.

The RGGI is related to but distinct from the Cap Regulation.  The RGGI controls greenhouse gas emissions across the nine States that participate in the RGGI, but does not restrict emissions in any particular State.  See The Regional Greenhouse Gas Initiative, Elements of RGGI, https://www.rggi .org/program-overview-and-design/elements [https://perma.cc /M59X-JV25].  The Cap Regulation controls emissions of electricity-generating facilities in Massachusetts, but not in other States.  See Department of Environmental Protection, Fact Sheet:  Electricity Sector Regulations, http://www.massdep.org /BAW/air/3dfs-electricity.pdf [https://perma.cc/PVD2-ESAU].

Predating the RGGI, the renewable energy portfolio standard (RPS) was established in 1997.  See G. L. c. 25A, § 11F, inserted by St. 1997, c. 164, § 50; 225 Code Mass. Regs. §§ 14.00, 15.00 (2016).  The RPS requires that retail suppliers of electricity deliver a certain percentage of the electricity generated from renewable energy sources such as wind, solar, and hydroelectric.  Renewable energy produced by generators that qualify for the RPS counts toward compliance with 310 Code Mass. Regs. § 7.75 (2017) (Clean Energy Standard Regulation), discussed infra.  See Department of Environmental Protection, Fact Sheet:  Electricity Sector Regulations, supra.

sources that emit greenhouse gas emissions."  G. L. c. 21N, § 3 (c), (d).[9]

Prior to our decision in Kain, the department relied significantly on the Commonwealth's membership and efforts through the regional greenhouse gas initiative (RGGI), particularly its "cap and trade program for electricity-generating facilities," to satisfy the requirements of § 3 (d). See Kain, 474 Mass. at 296-297.  As a participant of the RGGI, the Commonwealth "established the carbon dioxide budget trading program, which incorporat[ed] the RGGI scheme into its regulations and contain[ed] a schedule of the Commonwealth's annual 'base budget' . . . of carbon dioxide."  Id. at 296.

In Kain, 474 Mass. at 280, we concluded that the department had not fulfilled its statutory mandate under § 3 (d).  With respect to the electric sector, we reasoned that "although the RGGI program . . . [was] very important to the over-all regional scheme," it was established under a statute entirely separate from the act.  Id. at 296.  Furthermore, emission reductions from the RGGI regulation were already accounted for in the eighteen per cent reduction in emissions anticipated under the 2020 "business as usual" level.  Id. at 296-297.  Additionally,

_____

[9] Relatedly, the act also directs that the Commonwealth and its agencies promulgate regulations that "encourage renewable sources of energy in the sectors of energy generation, buildings and transportation."  G. L. c. 21N, § 6.

given that in-State power plants could purchase carbon dioxide allowances from generators in other RGGI-participating States, there was no way to ensure mass-based reductions in carbon dioxide emissions.  Id. at 297-298.  Accordingly, we ordered the department to "promulgate regulations that establish volumetric limits on multiple greenhouse gas emissions sources, expressed in carbon dioxide equivalents, and . . . such limits must decline on an annual basis."  Id. at 280.

On September 16, 2016, approximately four months after Kain was decided, the Governor issued Executive Order No. 569, titled "Establishing an Integrated Climate Change Strategy for the Commonwealth."  The order, in part, directed the department to promulgate final regulations by August 11, 2017, that satisfy § 3 (d) and that ensure that the Commonwealth meets the 2020 Statewide emissions limit mandated by the act.  Twelve days later, on September 28, 2016, the department began seeking input on proposed regulations of emission sources from stakeholders, including scheduling technical meetings for electricity sector stakeholders.  During these meetings, the department considered establishing a declining greenhouse gas emissions cap for Massachusetts power plants, effective from 2018 through 2050, later proposed as 310 Code Mass. Regs. § 7.74, the Cap Regulation.  The department also weighed establishing a clean energy standard, which would require an increasing percentage of

new clean energy to Massachusetts from retail suppliers; this standard was later proposed as 310 Code Mass. Regs. § 7.75 (CES Regulation).

On August 11, 2017, after consultation with the Department of Energy Resources, the agencies published the final Cap Regulation pursuant to §§ 3 (c), (d); the final CES Regulation pursuant to § 3 (c); and four additional complementary regulations, pursuant to § 3 (d).  Starting from a 2018 aggregate carbon dioxide emissions limit of 9,149,979 metric tons, the Cap Regulation mandated that in-State fossil-fueled power plants decrease their emissions by 223,876 metric tons each year until the emissions reach 8,507,299 metric tons in 2020 and 1,791,019 metric tons in 2050.  310 Code Mass. Regs. § 7.74(5)(a).  Complementing the Cap Regulation's reduction on emissions, the CES Regulation established an increasing level of clean nonemitting electricity that retail sellers must purchase annually.  See 310 Code Mass. Regs. § 7.75(4).  In 2018, the requirement was sixteen per cent.  Id.  By 2050, a minimum of eighty per cent of retail electricity sold to Massachusetts customers will be from clean energy sources.  Id.

On September 11, 2017, the plaintiffs filed their complaint in the Superior Court for judicial review of the agencies'

rulemaking, pursuant to G. L. c. 30A.[10] The plaintiffs' key contention was that the agencies acted unlawfully in promulgating the Cap Regulation. While the case was pending in the Superior Court, on January 31, 2018, a single justice of this court, pursuant to G. L. c. 211, § 4A, transferred the case to the county court. On February 9, 2018, the single justice reserved and reported the case to the full court for determination.

2. Discussion. a. Statutory authority to regulate greenhouse gas emission levels and limits associated with electric sector. As previously stated, § 3 (d) of the act provides that "[t]he department shall promulgate regulations establishing a desired level of declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions." The preceding section, § 3 (c), provides that "[e]missions levels and limits associated with the electric sector shall be established by the executive office and the department, in consultation with the department of energy resources, based on consumption and purchases of electricity

---

[10] Subsequently, Footprint Power Salem Harbor Development LP and Massachusetts Municipal Wholesale Electric Company successfully moved to intervene as plaintiffs. In addition to the plaintiffs in the present case, Calpine Corporation also filed a complaint in the Superior Court seeking review of the Cap Regulation, and that case was consolidated with this one. Calpine Corporation's case was thereafter resolved in the Superior Court and is not before us in this appeal.

from the regional electric grid, taking into account the regional greenhouse gas initiative and the renewable portfolio standard."  At issue in the instant case is the Cap Regulation, which establishes annually declining aggregate carbon dioxide emissions limits on electricity generating facilities located in the Commonwealth, pursuant to § 3 (d).  See 310 Code Mass. Regs. § 7.74(1).

The plaintiffs argue that the agencies may not impose an emissions cap on electricity generators under § 3 (d), because § 3 (c) specifically and separately regulates the electric sector.  The agencies counter that although § 3 (c) sets out specific procedures and requirements for regulation of the electric sector, it does not prohibit the department from imposing a declining emissions cap on that sector pursuant to § 3 (d), as long as the limits satisfy the requirements of § 3 (c).  We conclude that § 3 (c) and § 3 (d) complement each other, and that the electric sector is one of the multiple categories of sources of emissions that may be regulated under § 3 (d).  Furthermore, the department's determination that it must impose decreasing emissions limits on the electric sector in order to accomplish its essential statutory purpose is amply supported.

"In assessing the legality of an administrative agency's properly promulgated regulations, we employ sequentially two

well-defined principles. First, we determine, using conventional tools of statutory interpretation, whether the Legislature has spoken with certainty on the topic in question, and if we conclude that the statute is unambiguous, we give effect to the Legislature's intent" (footnoted omitted). Goldberg v. Board of Health of Granby, 444 Mass. 627, 632-633 (2005). "Second, if the Legislature has not addressed directly the pertinent issue, we determine whether the agency's resolution of that issue may 'be reconciled with the governing legislation.'" Id. at 633, quoting Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgt. Bd., 421 Mass. 196, 211 (1995). At the second stage, we afford "substantial deference" to agency expertise, and will uphold a challenged regulation "unless a statute unambiguously bars the agency's approach." Goldberg, supra, quoting Briggs v. Commonwealth, 429 Mass. 241, 253 (1999).

Taking these considerations together, we conclude that the agencies have the authority to promulgate regulations under § 3 (d) to establish emission limits on the electric sector, and, as detailed below, our interpretation is consistent with the act's fundamental purpose of reducing greenhouse gas emissions, and combatting climate change, in Massachusetts. Kain, 474 Mass. at 300. Furthermore, to the extent, if any, that the act is ambiguous, we conclude that the agencies'

interpretation is reasonable and entitled to deference.[11]  The
act certainly does not "unambiguously bar[] the agenc[ies']
approach."  Goldberg, 444 Mass. at 633.

The electric sector's transition away from fossil fuels is
critical to reaching the sustainable future that the act
envisions.  Presently, the electric sector accounts for
approximately twenty per cent of Statewide greenhouse gas
emissions.  See MA GHG Emissions Trends, MA GHG by Sector,
https://www.mass.gov/service-details/ma-ghg-emission-trends
[https://perma.cc/2F4B-M5RE].  Given that the electric sector is
one of the largest in-State greenhouse gas emission sources, it
would make little to no sense for the Legislature to have
excluded it from the critical emission reduction requirements
set out in § 3 (d).  There is also no express exclusion of the
electric sector from § 3 (d).  Furthermore, in order to achieve
its goal of reducing emissions by at least eighty per cent by

---

[11] The plaintiffs' argument that the agencies'
interpretation of the act is not entitled to deference because
the act is outside their sphere of expertise is unavailing.  See
Kain v. Department of Envtl. Protection, 474 Mass. 278, 286, 292
(2016) ("the department and the [S]ecretary [of Energy and
Environmental Affairs (secretary)] have considerable expertise
in addressing the challenges that climate change poses to the
Commonwealth").  See also St. 2008, c. 298, §§ 3, 4 (directing
department and secretary to implement act); Dowling v. Registrar
of Motor Vehicles, 425 Mass. 523, 525 (1997), quoting
Massachusetts Medical Soc'y v. Commissioner of Ins., 402 Mass.
44, 62 (1988) ("an administrative agency's interpretation of a
statute within its charge is accorded weight and deference").

2050, "the Commonwealth must achieve a significant reduction in [greenhouse gas] emissions from transportation, the heating of buildings, and the electric sector.  Because a significant percentage of vehicles and building systems must be electrified as a way to reduce [greenhouse gas] emissions," cutting emissions from the electric sector is a crucial initial step to achieving long-term progress in combatting climate change.  See Executive Office of Energy and Environmental Affairs & Department of Environmental Protection, Response to Comment on: 310 Code Mass. Regs. § 7.74, at 13 (Aug. 2017).

The importance of decreasing greenhouse gases from the electric sector is particularly apparent when the act's fundamental purpose to "attain actual, measurable, and permanent emissions reductions in the Commonwealth" is considered in the context of § 3 (c), including § 3 (c)'s emissions limits and consideration of trade allowances.  Kain, 474 Mass. at 300.  See Commonwealth v. Diggs, 475 Mass. 79, 83 (2016) (rejecting interpretation that would thwart statute's intended purpose).  As we recognized in Kain, supra at 297-298, "there is no way to ensure mass-based reductions in carbon dioxide emissions from power plants in the Commonwealth that participate in the RGGI," because they can purchase emission allowances from out-of-State generators.  Id. at 297-298. Additionally, "reductions from the RGGI regulation were [already] accounted for in the eighteen per

cent reduction in emissions anticipated under the 'business as usual' projection calculated prior to the application of regulations under § 3 (d)." Id. at 297. The RGGI regulatory regime regarding the electric sector is therefore not alone sufficient to satisfy the purposes of the act. The act is designed to go well beyond business as usual in terms of reducing emissions: to upend, rather than to uphold, the status quo. The electric sector is no exception.

Section 3 (d) places no restriction on the categories of emissions sources that the department may regulate. Kain, 474 Mass. at 284 n.9, 290-291. In Kain, we did observe that "the Legislature intended to treat emission reductions associated with the electric sector differently from reductions in other sectors of the economy." Id. at 297. This is because there are considerations specific to the electric industry to take into account, particularly the regional grid, the RGGI framework, and the renewable energy portfolio standard (RPS); additionally, the department, in regulating the electric sector, must consult with the Department of Energy Resources and the executive office. G. L. c. 21N, § 3 (c). Differential treatment of the electric sector, however, does not indicate its exclusion from § 3 (d). "Specific statutory authority to act in a particular respect does not bar consistent action under general statutory authority." Grocery Mfrs. of Am., Inc. v. Department of Pub.

Health, 379 Mass. 70, 76 (1979). See Pepin v. Division of Fisheries & Wildlife, 467 Mass. 210, 224-226 (2014) (statute creating requirements for certain types of endangered species' habitats did not preclude agency from promulgating regulations to further general goal of protecting endangered species).

The department promulgated the Cap Regulation pursuant to § 3 (c)'s requirements; the department consulted with the executive office and the Department of Energy Resources, considered energy consumption from the regional grid, and analyzed how the Cap Regulation would interact with RGGI and the RPS. See 310 Code Mass. Regs. § 7.74(1) (Cap Regulation promulgated by department and executive office "following consultation with the Department of Energy Resources and based on the considerations specified in . . . § 3 [c]"). The Cap Regulation properly takes into account the specific considerations of the electric sector identified in section § 3 (c), while including this large emitter of greenhouse gases in the ambitious emissions reduction regime of § 3 (d), which is central to accomplishing the act's overarching purpose. The two statutory provisions work together and complement each other. They are not mutually exclusive.

In sum, we conclude that § 3 (d) does not contain a regulatory exclusion for the electric or any sector, and we decline to read one in. "If that was the legislative intent,

the wording of the statute could have easily reflected it.  It does not" (footnote omitted).  Rowley v. Massachusetts Elec. Co., 438 Mass. 798, 802 (2003).  The agencies' interpretation of how § 3 (c) and (d) may be construed together, is also reasonable, and therefore, entitled to deference.  See Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997).  See also Pepin, 467 Mass. at 222, quoting Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 331 (2011) ("[A] regulation . . . need not necessarily find support in a particular section of [the enabling statute]; it is enough if it carries out the scheme or design of the chapter and is thus consistent with it").  Because the Cap Regulation satisfies the requirements of both § 3 (c) and § 3 (d), the plaintiffs' argument that the regulation is ultra vires must fail.

b.  Validity of 310 Code Mass. Regs. § 7.74.  The plaintiffs contend that, even if the agencies are permitted to regulate the electric sector under § 3 (d), the projected effects of the Cap Regulation render it arbitrary and capricious and inconsistent with the statutory purpose of reducing emissions.  A properly promulgated regulation "has the force of law . . . and must be accorded all the deference due to a statute."  Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 723, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983).  A party challenging the

validity of a regulation must prove "that the regulation is illegal, arbitrary, or capricious." Id. at 722. Such a plaintiff must establish "the absence of any conceivable grounds upon which [the rule] may be upheld." Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 776 (1980), quoting Colella v. State Racing Comm'n, 360 Mass. 152, 156 (1971). "That burden cannot be carried 'by arguing that the record does not affirmatively show facts which support the regulation.'" Dowell v. Commissioner of Transitional Assistance, 424 Mass. 610, 612 (1997), quoting Purity Supreme, Inc., supra. Rather, "we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." Consolidated Cigar Corp. v. Department of Pub. Health, 372 Mass. 844, 855 (1977). However, "a regulation that is irreconcilable with an agency's enabling legislation cannot stand." Quincy v. Massachusetts Water Resources Auth., 421 Mass. 463, 468 (1995).

Here, the plaintiffs build their case around the possibility that the Cap Regulation may cause modest emissions leakage. "Leakage," as defined in G. L. c. 21N, § 1, is "the offset of a reduction in emissions of greenhouse gases within the [C]ommonwealth by an increase in emissions of greenhouse gases outside the [C]ommonwealth." The plaintiffs contend that

generators within Massachusetts will produce less electricity in response to costs imposed by the Cap Regulation; as a result, Massachusetts will import more electricity from higher-emitting generators outside the State. Because the act directs the agencies to reduce Statewide emissions -- which includes greenhouse gases associated with the out-of-State production of electricity consumed in the Commonwealth -- the plaintiffs argue that this leakage runs contrary to the act's purpose. See G. L. c. 21N, § 1.

There are, however, multiple conceivable bases to support the rule. See Massachusetts Fed'n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 772 (2002). First, the Cap Regulation seeks to reduce emissions generated within the Commonwealth. As a recent baseline, in 2014, approximately 14,900,000 metric tons of carbon dioxide emissions was associated with the electric sector. The Cap Regulation sets forth a declining emissions limit from 9,149,979 metric tons of carbon dioxide in 2018 to 8,507,299 metric tons of carbon dioxide in 2020. See 310 Code Mass. Regs. § 7.74(5)(a). For the purposes of long-term planning and forecasting, the Cap Regulation also sets forth the long-term goal for emissions generated within the Commonwealth of 1,791,019 metric tons of

carbon dioxide in 2050.[12]

Additionally, as the agencies contend, the Cap Regulation's impact cannot be analyzed in a vacuum. Indeed, it was promulgated in concert with the CES Regulation, and the two rules were expressly "designed to work together to maximize the reduction of greenhouse gas emissions."[13] See Summary of Regulations: 310 Code Mass. Regs. §§ 7.74, 7.75 (attachment to filing entry form for final regulation). The CES Regulation requires retail electricity providers to procure an increasing percentage of electricity from clean energy sources each year. See 310 Code Mass. Regs. § 7.75(4). Because of the emissions reductions that will occur as a result of the CES Regulation, the agencies predict that the Cap Regulation's limit on greenhouse gases will be met without any decrease in production

---

[12] Additionally, with the statutory scheme imposing lower emission limits over time, the Legislature was aware that some leakage was inevitable; indeed, the regulations must be evaluated to determine whether they minimize leakage. See G. L. c. 21N, § 5 (vii). Here, even if the plaintiff's modeling is taken at face value, the most severe leakage projection would constitute less than one per cent of total New England greenhouse gas emissions in the one year, 2025, modeled. Some doubts as to whether leakage may occur need not prevent the department from acting to ensure that the electric sector is working towards the act's purpose. See Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 734 (1983).

[13] The plaintiffs, notably, do not take a position or contest the agencies' position that the Cap Regulation and 310 Code Mass. Regs. § 7.75, working together, would reduce greenhouse gas emissions.

by Massachusetts fossil fuel generators.  They predict that, as a result, little or no leakage will occur, because it will be unnecessary to shift to out-of-State producers in order to comply with the Cap Regulation.

Furthermore, even if the Cap Regulation does result in an increase in electricity imports, the agencies project that an increasing percentage of those imports will be derived from zero-emission sources, in part due to the CES Regulation's mandate that the Commonwealth consume greater percentages of clean energy each year.[14]  Finally, far from causing increased greenhouse gas emissions from out-of-State generators, according to the agencies, the two regulations together will send a market signal that Massachusetts' neighbors should invest in clean energy development in order to satisfy the Commonwealth's increasing demand for renewable energy.  To the extent that the agencies' projections rely on their own interpretations of these

---

[14] Additionally, because renewable resources have virtually no operating costs and generators can submit very low bids into the hourly wholesale electricity markets, clean energy resources will be dispatched first.  Even if the Cap Regulation imposes a constraint on in-State power plants, it is mere speculation that out-of-State electric suppliers will necessarily generate higher rates of greenhouse gas emissions, especially given that other States have similarly committed to ambitious targets for reductions of greenhouse gas emissions.  See, e.g., Conn. Gen. Stat. § 22a-200a (eighty per cent reduction of greenhouse gas emissions below 2001 level by 2050); R.I. Gen. Laws § 42-6.2-2 (eighty per cent reduction of greenhouse gas emissions below 1990 levels by 2050).

regulations, they are entitled to deference. Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 184 (2009). In sum, the plaintiffs are far from showing "the absence of any conceivable grounds upon which [the rule] may be upheld." Massachusetts Fed'n of Teachers, AFT, AFL-CIO, 436 Mass. at 772, quoting Purity, Supreme, Inc., 380 Mass. at 776.

c. Regulations promulgated under G. L. c. 21N, § 3 (d), beyond December 31, 2020. Section 16 of the act provides that "[t]he department . . . shall promulgate regulations pursuant to [§ 3 (d)] not later than January 1, 2012, which regulations shall take effect on January 1, 2013, and shall expire on December 31, 2020." The plaintiffs contend that § 16 of the act clearly and unambiguously invalidates any emission limits beyond December 31, 2020, because the provision contains an "unambiguous sunset date" for § 3 (d). We disagree. The most sensible reading of § 16 is that, after December 31, 2020, only the current regulations promulgated under § 3 (d) expire. The Department's authority and obligation to promulgate new regulations under § 3 (d) after December 31, 2020, is undisturbed. See Kain, 474 Mass. at 289 n.14 ("sunset provision exists because after 2020, new annual limitations on emissions would have to be issued to ensure that Statewide limit for 2030, which has yet to be established, will be met").

"The court does not determine the plain meaning of a

statute in isolation" but rather in "consideration of the surrounding text, structure, and purpose of the Massachusetts act" from which this subsection is derived (citation omitted). ENGIE Gas & LNG LLC v. Department of Pub. Utils., 475 Mass. 191, 199 (2016). "Moreover, our interpretation of statutes is not restricted to determining only their 'simple, literal or strict verbal meaning' but also considers their 'development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part . . . ." Kain, 474 Mass. at 286, quoting Oxford v. Oxford Water Co., 391 Mass. 581, 588 (1984).

First, § 16 of the act's surrounding text and structure is instructive. Nestled within §§ 10-18, this section is focused on implementation deadlines, not termination. Kain, 474 Mass. at 283, citing St. 2008, c. 298, §§ 10-18 ("The design of the act is synergistic, imposing numerous directives and timelines on the [S]ecretary [of Energy and Environmental Affairs] and the department to perform certain duties, subject to deadlines."). Second, the act's purpose is of crucial importance. The long-term goal of the act is to ensure that the Commonwealth meets the 2050 Statewide emission limit of at least eighty per cent below the 1990 level. See G. L. c. 21N, § 3 (b). But to set the Commonwealth on a course to meet this limit, the year 2020,

as the first and nearest short-term goal, is of special importance. See, e.g., G. L. c. 21N, §§ 3 (a), (b), 4; Secretary of Energy and Environmental Affairs, Massachusetts Clean Energy and Climate Plan for 2020, at 12 (updated Dec. 31, 2015), https://www.mass.gov/files/documents/2017/12/06/Clean%20 Energy%20and%20Climate%20Plan%20for%202020.pdf [https://perma.cc /VWG2-PKQP]. It is a crucial step along the way, but not a termination point in any sense. The existing regulations will sunset but will be replaced by new regulations taking into account updated information. To hold that the ability to set declining annual aggregate emission limits under § 3 (d) permanently expires would create an absurd result: a long-term 2050 Statewide emissions goal without, after December 31, 2020, any tools to reach it. See Flemings v. Contributory Retirement Appeal Bd., 431 Mass. 374, 375-376 (2000) ("If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results").

We conclude that the Legislature did not intend to render § 3 (d) meaningless after December 31, 2020. Rather, the department was expected and required to promulgate new regulations at that time, based on updated information, to ensure that the future Statewide limits for 2030, 2040, and 2050 will be met. See Kain, 474 Mass. at 289 n.14 ("after 2020, new

annual limitations on emissions would have to be issued").

3. <u>Conclusion</u>. For the reasons discussed, we conclude that the department has the authority to promulgate regulations under § 3 (d) to establish emission limits on the electric sector. We also conclude that the Cap Regulation was properly promulgated, has the force of law, and must be accorded all the deference due to a statute. Finally, we conclude that § 3 (d) remains in effect after December 31, 2020, and that the department shall promulgate new regulations to ensure that the interim and 2050 Statewide limits will be met.

We remand the matter to the single justice of the county court, where an order of remand to the Superior Court shall issue for further proceedings consistent with this opinion.

<u>So ordered</u>.